(*) FRANKLIN BANK versus COOPER, Executor.

Prior to the expiration of a corporation charter, it is competent for the Legislature to provide that actions may, after the charter has expired, be commenced and prosecuted in the name of the corporation for the benefit of the former stockholders.

A special Act extended the existence of a corporation during a limited period, for the collecting of its debts, and authorized its trustees to institute such

Franklin Bank *v.* Cooper.

actions in its name, at any time within that period, and to prosecute the same to final judgment. — *Held*, that such actions, *commenced* within the allowed period, may be *prosecuted* after it has expired.

The official bond, given by a bank cashier, with the condition required by the statute for his doings, and with condition for additional acts, though invalid as a statute bond, is valid at the common law; if such conditions require no immoral or unlawful act.

The official bond of a bank cashier, does not become valid as a contract until accepted. Though the law provides, that in no case shall such a bond be signed by a director, yet such a bond, *signed* by one as surety while he was a director, will be valid against him, *if* it was not *accepted* until after he had ceased to be a director.

The declarations of a corporation *director* respecting past transactions, are not admissible as evidence against the corporation.

The declarations of a trustee, in whom is vested the legal interest, though acting wholly for the benefit of another, are admissible, though they may affect not his own interest, but only the interest of the *cestui que trust*.

It is a fair presumption that one, becoming a surety, does it upon a belief that the principal parties are conducting in the usual course of business, subjecting him only to the ordinary risks attending it.

To accept a surety known to be acting upon a belief, that there are no unusual circumstances by which his risk will be materially increased, while the party, thus accepting knows that there are such circumstances, and withholds the knowledge of them from the surety, though having a suitable opportunity to communicate them, is a legal fraud, which discharges the surety.

The bond of a bank cashier, framed to cover past as well as future delinquencies, will be invalid against a surety, if his name was procured at the desire of the directors, they knowing that past defalcations existed, of which he was ignorant, and withholding the knowledge from him, though with a suitable opportunity to communicate it.

ON REPORT, from *Nisi Prius*, WELLS, J., presiding.

ACTION OF DEBT, brought Sept. 13, 1850, upon the official bond of Hiram Stevens, who had been for many years the plaintiffs' cashier.

It was dated Oct. 1, 1847, and was signed by the defendant's testator as one of the sureties. When presented in Court the following words were found indorsed upon it, viz. — " Approved by vote of directors October 11, 1847, J. Otis, President."

Its condition was that " whereas said Stevens has been appointed cashier, &c., now if he shall during his continuance

in office as cashier, truly and faithfully perform and discharge the duties of cashier, and shall, when he vacates the office, a true and faithful account make, and all notes, drafts, moneys and all and every property of every name and nature shall truly and faithfully render and deliver to the directors of said bank, *and shall account for all notes, drafts and moneys, drafts, notes and property heretofore entrusted to his hands and possession, as cashier of said bank, since he has held the said office,*" then the bond is to be void.

By rule of Court, the action was referred, for the purpose of ascertaining " whether any deficiency or defalcation in the accounts of the cashier, or in any of his acts and doings, as cashier, for which his sureties are responsible, exists or has taken place; and if so, the amount thereof, and how and when the same occurred," which amount should be the measure of damages in this suit, subject to the opinion of the Court; provided that in other respects the suit is maintainable.

The award of the referees was in substance, *that* " a deficiency or defalcation exists in the cashier's accounts, for which the sureties on his bond are responsible; *that* it occurred between the first day of Jan. 1844 and the first day of Oct. 1847, and, *that* the plaintiffs recover on the bond in suit $5822,71."

The defendant contended that no suit upon this bond could be maintained, without proof that it had been accepted by the directors. Thereupon, to prove such acceptance, the plaintiffs called Joseph Eaton. Being sworn on the *voire dire*, he testified that he was one of the directors of the bank in 1844, 1845, and up to Oct. 1846; and that he was one of the trustees to close up the affairs of the bank and to prosecute this action.

The defendant then offered to prove by Alpheus Lyon, *that* he, the said Lyon, was one of the Bank Commissioners of the State; *that*, during the years 1844, 1845, 1846 and 1847, the affairs of the Franklin Bank were conducted with great looseness and irregularity; *that* the cashier was negligent; *that*

from the manner in which the books were kept and the business transacted, it was impossible to ascertain the condition of the bank at any time during those years, and whether the cashier was a defaulter or not ; *that* he notified the directors and among others Eaton, of this state of things, and requested him to have it corrected ; and *that* Eaton promised it should be done.

The Judge ruled that such testimony, if received, would not show a disqualification of Eaton as a witness for the plaintiffs. Eaton was then sworn in chief, and testified *that*, being in the bank about the middle of Oct. 1847, he saw there the bond now in suit for the first time ; *that* it then had upon it the same indorsement which it now has ; *that* Otis, the president, and two other of the directors were present ; and *that* the bond was left with the president.

The Judge ruled that this was sufficient evidence of the acceptance of the bond. The plaintiffs then stopped.

Several grounds of defence were presented.

1. That the bond was void, because not conformable to the statute prescribing the form of cashier's bonds.

[*Mem.* — The R. S. c. 77, § 24, provides that cashiers, before they enter upon the duties of their office, shall give bond, conditioned for the faithful performance of the duties of the office.]

2. That the bond was not binding upon the defendant's testator, because he was one of the directors of the bank at the time of its execution.

[*Mem.* — The R. S. c. 77, § 24, provides that " in no case shall the bond, given by the cashier, be signed by any of the directors."]

It was admitted that the testator was elected a director at the annual meetings in 1844, 1845 and 1846, and that the annual meeting for 1847 was on October 5. The bond was dated October 1, 1847.

3. That the plaintiffs had ceased to be a corporation, its charter having expired.

[*Mem.* — The charter was granted in 1832 and was to con-

tinue in force until October 1, 1847. But by a general Act all banks were to "continue corporate for and during two years from the time when their charters shall respectively expire, for the sole purpose of collecting their debts, &c., and capable to prosecute and defend suits at law, and to choose directors for the purposes aforesaid and for closing their concerns.

By a special Act of June 9, 1849, c. 196, § 1, the Franklin Bank was to "continue in-its corporate capacity for two years from the first day of October, 1849, for the sole purpose of collecting the debts due to the corporation ; and the stockholders were authorized to choose three persons as trustees of the corporation, with power to prosecute and defend, in the name of the bank, any suits at law or in equity."

The same Act, § 2, provides that the trustees so chosen, shall have power to receive all demands belonging to said bank, in trust for the use of the stockholders, and to prosecute to final judgment, execution and satisfaction, any claim or demand which may be pending in the name of said corporation, and to institute suits in the name thereof any time during said two years and to prosecute the same to final judgment, execution and satisfaction."]

4. That the bond was not obligatory, because the plaintiffs had neglected, in some previous years, to take a bond from the cashier, as required by the statute, and the defendant called upon the plaintiffs to produce any bonds taken by them for 1844, or 1845 and 1846 ; but none were produced.

5. That the defalcations, as shown by the award of the referees, all existed prior to the date of the bond, and were well known to the president and some of the directors at the time when the bond was executed, but were not communicated to the testator. Upon this point the defendant offered to prove, by Mr. Lyon, the facts above recited, and that he communicated to Mr. Otis, the president, and to Mr. Young, another of the directors, the gross mismanagement and irregularity which prevailed in the bank, and the cashier's want of competency. This evidence was rejected.

The defendant called M. O. Mitchell, who stated that his wife was a stockholder in the bank, and that, for that reason, he was unwilling to testify. He was, however, required to, and testified *that* he attended a meeting of the stockholders, the first Monday of October, 1847, and a special meeting also in the spring of 1848, and other meetings also; *that* he saw the bond in suit at *some* of these meetings; *that* there were conversations at these meetings about the condition of the bank; *that* he thought it was in October, 1847, when he, at said meeting, inquired of the president why they had not taken bonds of the cashier in former years; *that* the president (Otis) replied that they thought all things were going right, and did not know of any trouble until lately; *that* they had now got a bond to cover all deficiencies; *that* when they found there was a deficiency they threatend to sue the cashier (or might use the words prosecute him,) and required him to get Cooper, the testator, to sign a bond with him; *that* he (Otis) drew up the bond, and told Stevens if he got Cooper on it, it would be satisfactory; that he, (Cooper,) was left off from the board of directors to enable Stevens to get him on the bond; and *that* Stevens took the bond after he had drawn it, and got it signed. The witness also testified that the testator was not present at these meetings or conversations.

The defendant also offered to prove, by the testimony of Wm. Stevens, 2d., one of the co-sureties on the bond, but who was released by *defendant*, that said Otis, being president of the bank, and one of the trustees prosecuting this action, in the autumn of 1849, made to him statements similar to those made to said Mitchell, but these statements, not appearing to have reference to any declarations of Otis at any meeting of the stockholders or directors, were rejected.

If the excluded testimony offered by the defendant was admissible; or if the testimony of Mitchell would have any legal effect upon the case, the action is to stand for trial. But if such rejected testimony was inadmissible, and if the testimony of Mitchell would have no legal effect upon the case, the Court is to render judgment on nonsuit or default,

on such of the testimony as was admissible, having power to draw inferences as a jury might.

*F. Allen* and *H. W. Paine*, for the plaintiffs.

1. One of the defences set up is that the bond is not in the form prescribed by the statute. But there is no form prescribed. The statute only requires that the cashier shall give bond, conditioned for the faithful performance of his duties. It does not prohibit the insertion of other conditions. A bank might fear a defalcation, and be unable to show under which of several bonds it occurred; or it might distrust the skill of the cashier. There is no rule of policy, which forbids their guarding against such dangers.

2. Another defence is that the testator was a director when he signed the bond. The ordinary presumption is that an instrument is signed the day of its date. But as to this bond, the presumption is that it was not signed till the testator ceased to be a director; otherwise the parties violated the law.

Mitchell says Otis told him they left off Cooper so that he might sign the bond; which is strong proof that he was left off before he signed.

The law undoubtedly was intended to prevent the sureties from passing upon their own sufficiency.

The date of a bond is not essential. It would be good without a date. A bond becomes operative from its *delivery* or *acceptance*. 6 Mass. 219; 9 Mass. 310; 8 Mass. 338; 12 Mass. 456. The word "signed," in the statute is not a controlling word. If it be, it must be construed to mean " executed," which includes the delivery.

But if not good as a statute bond, it is valid at the common law. *Morse* v. *Hodgdon*, 6 Mass. 314; *Clapp* v. *Cofran*, 7 Mass. 98; *Freeman* v. *Davis*, 7 Mass. 200; *Chandler* v. *Smith*, 14 Mass. 313; *Worcester Bank* v. *Reed*, 9 Mass. 267.

That a cashier's bond is retrospective, does not vitiate it. *Dedham Bank* v. *Chickering*, 7 Pick. 335 – 340; *Johnson* v. *Frankfort Bank*, 23 Maine, 322.

As the statute does not forbid such a bond, so the common law allows it, for it required nothing unlawful. 3 Humph. (Missouri,) 176.

3. Another defence is that the plaintiff corporation is no longer in existence.

But all this matter is obviated by the Act of 1844. That gives to the trustees power to prosecute the suit in the name of the corporation. The defendant's construction of that Act would annul it.

4. To the defendant's pretence of fraud in the directors' concealment from him of knowledge which they had of previous defalcation, we reply that it is not shown that the testator had not the same knowledge. The presumption is that he had, for he was a director. It is quite possible he would sign though he did have the knowledge, relying on the ability of the cashier to respond.

But the directors were not bound to impart the information. It is enough that they are not shown to have practiced any deception. It is sufficient to say, however, that no fraud was proved.

*Evans,* for the defendant.

The statute allows nothing to be secured by a cashier's bond except his faithfulness. The law requires bank cashiers to renew their bonds annually. R. S. c. 77, § 24. The office is but an annual one. The bond was but a cashier's annual bond. This appears by its recital, "whereas Hiram Stevens has been appointed cashier," and the condition refers to that appointment. This bond was given in pursuance of law and was undoubtedly understood by the surety to be a statute bond, prospective only in its character and intent.

WHITMAN, C. J., in *Frankfort Bank* v. *Johnson,* 23 Maine, 325, says, "and moreover the Legislature when they required the renewal of the bonds annually, cannot well be believed to have contemplated that the bondsmen of each year should be holden responsible for the fidelity of cashiers, except for the year for which the bonds were taken."

The recital in the bond, controls and gives meaning to the condition. *Liverpool Water Works* v. *Atkinson*, 6 East, 510 ; Burge on Suretyship, 71, 72, and cases cited in the text.

As Grose, J., says, in 6 East, 511, — " For any man called upon as a surety to subscribe to the obligation, would naturally understand on reading the condition, that he was only to answer for his principal for 12 months." — We say, no one in reading this bond and knowing the law of the State as to renewals, would understand it in any other light than as a *statute, prospective* bond.

The retrospective clause, interpolated into this bond, does not carry back beyond the time of the new appointment, the liability of the surety.

Its language will be satisfied by such limitation of the liability.

" The extent of the liability to be incurred, must be expressed by the surety, or *necessarily* comprised in the terms used in the obligation or contract."

"It is to be *construed strictly* — that is, the obligation is not to be extended to any other subject, to any other person, or *to any other period of time* than is expressed, or *necessarily* included in it." Burge on Sur. c. 3, p. 40. The guaranty as to past business was inoperative.

The bond is not valid against defendant's testator, having been obtained by fraud.

It was well known to the president, and to the active directors, Eaton and Young, that the cashier was and had been for some years, negligent and incompetent ; that the affairs of the bank were in great disorder and confusion ; that a defalcation existed for a large amount ; that this defalcation occurred during a period of time, when by their own neglect, and for which they were liable, no security had been taken for the fidelity of the cashier.

All this they concealed from the surety, and such concealment *is fraud.*

Cooper, the testator, had a right to suppose that every thing

discovered or known by his associates, had been communicated to him.

It was their duty so to have communicated. "*Uberrima fides,*" is required of co-partners, associates, co-trustees, &c. &c.

It was the duty of the *three* directors to whom the state of the bank was known, to have taken measures for the removal of the cashier ; to dismiss him instantly.

By consenting to retain him, they grossly deceived the surety.

The cashier was made the instrument of the president and directors, under a threat of prosecution, of entrapping Cooper, who was designedly dropped from the board, for the purpose.

All this was in bad faith, there can be no stronger case of "*suppressio veri,*" no clearer one of a deliberate purpose to deceive.

It has been held, and properly, that the retaining a cashier in office, *after a knowedge of his deficiencies,* does not exempt his surety for *previous* defaults, within the limits of the bond. *State Bank* v. *Chetwood,* 3 Halst. 28 ; *Taylor* v. *Bank of Kentucky,* 2 J. J. Marsh. 568.

For *subsequent* defaults, it seems that it would be an excuse of the surety.

Why ? Undoubtedly, because it would be fraudulent toward the surety.

How much greater the fraud, knowing the deficiency, to obtain by concealment of the truth, under such a bond as this, indemnity for their own neglects ? "Fraud by the creditor in relation to the obligation of the surety, or by the debtor with the knowledge or assent of the creditor, will discharge the surety," &c. Burge on Sure. 218.

Thus in maritime policies, "if the party had no intention to enter, and would not have entered into the contract, if the fraud had not been practised ; surety discharged. *Ib.* 219.

TINDAL, C. J., in *Stone* v. *Compton,* 5 Bing. N. C. p. 142, says : —

" The principle to be drawn from the cases, we take to be this — that if, with the knowledge or assent of the creditor,

any material part of the transaction with the debtor is misrepresented to the surety, the misrepresentation being such, that but for it, the surety would not have become such or his liability would have been less, the security so given is voidable at law on the ground of fraud." Cited in Burge, p. 219.

Again, on p. 220 — "The preceding definition comprehends the fraud — which consists in the representation of that which is false, and that which consists in the suppression of what is true." &c.

The case of *Pidcock* v. *Bishop*, 3 B. & C. 605, and S. C. 6 Dow. and Ryl. 505, cited in the text of Burge, 225, is strongly in point, as *" suppressio veri,"* amounting to fraud. q. v. The bond, then, even viewed as a common law bond, could be of no validity as against the surety.

The bond is dated October 1, 1847, signed by surety that day. Cooper was then a director of the bank, and could not be accepted as surety. R. S. c. 77, § 24. As to him the bond was void.

This action cannot be maintained, the charter of the bank having expired before it was commenced.

The Act of June 9th, 1849, c. 196, prolonged the " corporate capacity" of the bank for one single purpose, and one only, *"for the sole purpose of collecting the debts due to the corporation."*

A bond for official fidelity, is, in no sense, *" a debt due to the corporation."* At all events, when the extended time had expired the suit could be no further prosecuted.

The stockholders had no power, and could confer none upon trustees, other than is expressed in the Act, viz. to collect debts, and to distribute proceeds to the stockholders. *Reed* v. *Frankfort Bank*, 23 Maine, 321 ; *Whitman* v. *Cox*, 26 Maine, 339.

The testimony of Stevens should have been admitted to prove the circumstances under which the bond was procured, as stated by Otis.

SHEPLEY, C. J. — This suit was commenced on September

13, 1850, upon a bond made to the bank by Hiram Stevens ?
as principal, and the defendant's testator and others, as his
sureties, to secure his faithful performance of the duties of
cashier, and other duties.

1. Whether the action can be maintained may depend upon
a construction of the Act approved on June 9, 1849, c. 196.
By the first section the corporate capacity of the bank is con-
tinued for two years from the first day of October then next,
for the sole purpose of collecting the debts due to the corpo-
ration. The stockholders are authorized to choose three per-
sons as trustees who are empowered to prosecute and defend
in the name of the bank any suits at law or in equity. By
the second section the trustees are authorized to prosecute to
final judgment, execution and satisfaction, any claim or de-
mand (meaning any action) which may be pending, in the
name of said corporation; " and to institute suits in the name
thereof any time during said two years, and to prosecute the
same to final judgment, execution and satisfaction."

Although the corporation ceased to exist on the first day of
October, 1851, the Legislature might authorize the trustees to
prosecute suits then pending for the benefit of the former cor-
poration, in that or any other name. The trustees, by the pro-
vision of the Act, might commence suits at any time prior to
and on the last day of the two years. Was it the intention,
that all suits should then abate, and that the debtors should
then be absolved from all liability to pay, and that the former
stockholders should be deprived of all benefit to be derived
from existing debts?

A construction producing such results would be at variance
with the general policy and purpose of the law, which pro-
vides, that on the dissolution of any corporation all its real
and personal estate shall be vested in the individuals, who
may be stockholders at the time. c. 76, § 28. It should not
be adopted, if the language may fairly receive a different con-
struction. So far from difficulty is the construction, which
would avoid such consequences, that it requires no more than
to permit the language used to operate according to its literal

Franklin Bank *v.* Cooper.

meaning.    The trustees are expressly authorized to prosecute actions commenced within two years " to final judgment, execution and satisfaction."    There is no limitation of the time within which this is to be done.    There was no occasion for it ; the purpose being to allow sufficient time to accomplish the object.    It is only by implication that any limitation of that time can be made, and if one be so made it may extend to the day after the suit has been properly commenced.

If the purpose had been no more than to continue the charter for two years for the collection of debts within that time, this would have been fully accomplished without the careful insertion and repetition of language authorizing the prosecution of suits to final judgment and satisfaction.    A construction which would limit that power to the two years would give no effect to the language conferring it.

Any inconsistency between the provisions of the first and second sections of the Act, unless such limitation of the power to prosecute be admitted, is not perceived.    By the first section the corporation is continued for two years for the sole purpose of collecting its debts.    By the second section the trustees are authorized to use its name after that time to prosecute pending suits.

As by the general Act respecting corporations all their property at the time of their dissolution is vested in the individuals composing their stockholders, it is said, that the trustees in this case must after the two years be deprived of all power and interest in the debts then due.    The second section of the Act of 1849, declares, that the trustees shall have power to receive all demands belonging to said bank, in trust, for the use of the stockholders ; and the provisions of the statute, c. 76, § 28, are thereby so far varied as to permit them to exercise the power thus conferred.    Although no time is fixed for the execution of that trust, and for a distribution of the moneys collected, there can be no difficulty in causing it to be executed so soon as the stockholders become entitled to have it done.

Nor will any party defendant, should he be successful in his

defence, necessarily lose his costs.   Although the  trustees are not personally liable, the Court may on  motion  stay  proceedings until security be given for their  payment.   *Freeman* v. *Cram*, 13 Maine, 255.

Nor will it be necessary, that accounts filed in set-off should be disallowed.   They would constitute a part of the  suit  to be prosecuted.

It is no valid objection to a literal construction  of the  Act, that no provision was made to  enable  creditors of the  bank to prosecute suits against it after the expiration of its  charter. It was only leaving them in the  condition  of all  other  creditors of corporations, which have  been  dissolved.   No such provision has been or can well be made  after the  dissolution of a corporation.

2. It is alleged, that the bond was not valid because  it  was not made in conformity to the provisions of  the statute.

The statute, c. 77, § 24, prescribes no  form.   It only requires, that a cashier should give a bond  conditioned for the faithful performance of his  duties.   The condition of this bond does require more.   A bond with  a  condition  differing from that required by a statute is not  necessarily void.   It will be good, not as a bond by the statute, but as a contract at common law, if the condition does not  require  the performance of any immoral or unlawful act.   There was nothing wrong or unlawful in requiring the cashier to account for property entrusted to him in former years as cashier.

If the language used will permit it, the bond should receive a construction, that will make the sureties liable only for official acts or neglects subsequent to its execution.   Hence it has been decided, that a bond with a condition, that the principal has accounted and will account, binds the sureties for an account only from the time the official term commenced, for which they became his sureties.   *Armstrong* v. *United States*, 1 Peters' C. C. R. 46; *United States* v. *Brown*, Gilpin, 155.

The language used in the condition of this bond will not allow a construction, which would thus limit the liability of

Franklin Bank *v.* Cooper.

the sureties. After providing for the faithful performance of his duties and for his accounting for all property entrusted to him during his continuance in office, the condition contains this clause : — "And shall account for all notes, drafts and money, drafts, notes and property heretofore 'entrusted to his hands and possession as cashier of said bank since he has held the said office of cashier of said bank." No person about to become surety upon reading the condition could fail to understand, that he would become liable for an account by the cashier of all property entrusted to him since he had been cashier' as well as for his future faithfulness. If he voluntarily became a surety on a bond containing such a provision, he cannot by any legal construction be relieved from the obligation thus assumed.

3. The bond is alleged to be void because the testator became a surety upon it, while he was a director of the bank, in violation of the provisions of the statute, c. 77, § 24. It bears date on October 1; the testator ceased to be a director on October 5. The bond appears to have been approved on October 11. It did not become a valid contract until accepted. The bank did not violate any law, by receiving the testator at that time as a surety.

4. The declarations of a director of a corporation respecting its past transactions have been held to be inadmissible as testimony. *Polleys* v. *Insurance Co.* 14 Maine, 141. The declarations stated in the testimony of Mitchell, would rather appear to have been in a meeting for business when the bond in suit was under consideration and accepted. The meeting for the choice of officers appears to have been holden that year on October 5. Although the bond bears date before that time, it must be presumed to have been executed after the choice of officers, and it appears to have been executed before those declarations were made.

The testimony offered and excluded of William Stevens, 2d., respecting similar declarations, made by Mr. Otis in the autumn of 1849, would not be admissible as stating the declarations of an officer of the corporation. But at that

time Mr. Otis had become one of the trustees, holding the legal interest in all the assets of the corporation, and using the corporate name, only to enforce the claims of the trustees to recover in this and other suits, and his declarations, being a trustee and a party having a legal interest in the bond, would be admissible.

5. It is alleged, that the signature of the testator to the bond was procured by fraud. It is not alleged to consist in any fraudulent or positive act, but in withholding from him the knowledge, that there was an existing deficiency in the accounts of the cashier.

The testimony of Alpheus Lyon, as offered and excluded, would not, had it been received, have proved, that the directors who received the bond, knew that there was an existing deficiency in the accounts of the cashier. It would only prove irregularity and neglect in keeping his accounts in past time. The condition of the bond did not make the testator liable for such neglects. His responsibility for the past years was limited to an account for all property.

The testimony of Mitchell, as reported, states, that the president of the bank, in a meeting of the stockholders, informed him, "that when they found there was a deficiency, they threatened to sue the cashier; or might use the words prosecute him, and required him to get Cooper, the testator, to sign a bond with him."

There will not be found an entire agreement in the decided cases and books of authority, respecting the effect of a concealment or an omission to communicate facts known to the party seeking security, and unknown to the party about to become a surety. In some codes of law, and in some decisions, the conclusion is arrived at from a consideration, whether the facts omitted to be stated were intrinsic or extrinsic to the contract. And in others whether the person about to become a surety sought information of the party having the knowledge and seeking the security.

A few cases only will be noticed. In the case of *Pidcock* v. *Bishop*, 3 B. & C. 605, the defendant, at the request of Thomas

Tickell, made a guaranty to the plaintiffs for pig iron to be delivered to Tickell. The plaintiffs without the knowledge of defendant had agreed with Tickell, that he should pay them ten shillings per ton more than the market price, to be applied to the payment of an old debt due from Tickell to one of them. The Court decided, that the withholding of the knowledge of that agreement was a fraud upon the defendant and that his contract was not binding.

In Maltby's case, as stated by Lord ELDON in the case of *Smith* v. *Bank of Scotland*, 1 Dow. Parl. Rep. 294, a deficit existed in the accounts of a clerk of the Fishmonger's Company, and a person became surety without a knowledge that he was a defaulter. Lord ELDON was of opinion that by a concealment of that fact the surety was discharged.

In the case of *Stone* v. *Compton*, 5 Bing. N. C. 142, the defendant became surety for Coxe & Chambers for £2600. Part of that sum was not advanced but retained in payment of an old debt. It was insisted, that the doctrine respecting concealment was applicable only to cases of guaranty, but the Court observed, that it could see no sound legal distinction arising from the form of the security; that the mere fact that part was to be deducted in payment of an old debt without any communication of that fact to the surety would not be sufficient to release him; for the plaintiffs were not to be made responsible for a want of communication between the principal and surety. The surety was relieved because a deed was read to him containing a recital that the old debt had been paid.

The fact, that part of the money loaned was to be applied to the payment of an existing debt, could not be regarded as a matter unusual in the ordinary course of business. Money is known to be as frequently borrowed to pay existing debts as to make new purchases.

A question respecting the validity of a surety's contract was elaborately argued and much considered in the case of *Etting* v. *The Bank of the United States*, 11 Wheat. 59. The Court having been equally divided no opinion was expressed.

The judgment in the Circuit Court was affirmed. By the instructions there given the surety would not be discharged by an omission to make known to him, that the cashier had fraudulently appropriated funds of the bank to his own use, unless he made inquiry with reference to his becoming surety.

In that case the plaintiff in error was not about to become a surety on the official bond of the cashier, but a surety for him for a debt due from him to the bank; and the true question was, whether the bank was obliged to make known to the surety in what manner the principal became indebted to it. It may be further observed, that it does not appear, whether the officers of the bank had opportunity to make those facts known to the surety.

It is not readily perceived how a person desirous of obtaining security can be considered to be guilty of a fraud in law by omitting to make known facts even of an important character affecting the risk of the surety, when it does not appear, that he had an opportunity to do so. On the contrary when he does know such facts and has reason to believe, that they are not known to the proposed surety, if information be sought from him, or if he have a suitable opportunity, and the facts are of such a character, that they are not found in the usual course of that kind of business, and are such as to materially increase the risk, it is not perceived, that it is not a duty to make them known.

In the commentaries upon equity jurisprudence, the rule is not stated with the qualification, that there may be an omission to state such facts, unless the surety makes inquiry. Nor does it even require that the party taking the security, should have a suitable opportunity to make the communication. The rule is thus stated : — " If a party taking a guaranty from a surety, conceals from him facts which go to increase his risk, and suffers him to enter into the contract under his false impressions as to the real state of facts, such concealment will amount to a fraud, because the party is bound to make the disclosure." 1 Story's Com. Eq. § 215.

It is generally admitted, that an omission to communicate

Franklin Bank *v.* Cooper.

circumstances materially affecting the risk known to one party and unknown to the other, will destroy the validity of the contract, whenever the party having the knowledge is bound to communicate it. The difficulty consists in arriving at a correct conclusion under what circumstances one is so bound. He is so bound when his relations are such, that the other party is entitled to repose any particular confidence in him, and when inquiries are made of him respecting the surety-ship. Is he not equally bound when he has a suitable opportunity to make them known?

There can be no doubt, that the fact that there was known to be an existing deficiency in the accounts of the cashier if communicated to the testator might have had an important influence on his conduct. No doubt that the risk assumed would be materially increased thereby. One, who becomes surety for another, must ordinarily be presumed to do so upon the belief, that the transaction between the principal parties is one occuring in the usual course of business of that description, subjecting him only to the ordinary risks attending it; and the party to whom he becomes a surety must be presumed to know, that such will be his understanding and that he will act upon it, unless he is informed, that there are some extraordinary circumstances affecting the risk. To receive a surety known to be acting upon the belief, that there are no unusual circumstances, by which his risk will be materially increased, well knowing that there are such circumstances and having a suitable opportunity to make them known and withholding them, must be regarded as a legal fraud, by which the surety will be relieved from his contract.

This position although not found to be stated in terms, will in effect be found sustained by the opinions and reasonings of many sound judicial minds.

If a jury in this case, should be satisfied, that the legally constituted agents or officers of the bank knew, that the cashier was a defaulter and that there was a deficiency in his accounts then existing, and that he was required to obtain the testator to become his surety for that existing deficiency with

out making that fact known to the testator, having a suitable opportunity to do so, it might be their duty to find a verdict for the defendant. As the report of the case provides, that " if the testimony of Mitchell would have any legal effect upon the case, the action is to stand for trial," and as that testimony may possibly have such an effect, the case is to be submitted to the consideration of a jury.

TENNEY, HOWARD, RICE and APPLETON, J. J., concurred.