# CASES DETERMINED

# SUPREME COURT OF JUDICATURE

## STATE OF NEW JERSEY.

### FEBRUARY TERM, 1877.

---

JOSEPHUS SOOY, JUNIOR, JOHN S. IRICK, ET AL. ADS. THE
STATE OF NEW JERSEY.

1. The receipt of the state treasurer is not evidence of the moneys paid to
   him, unless the same be countersigned by the comptroller, but the
   statute does not invalidate such payment itself for the want of such
   countersigning.
2. A person taking a bond for the future good conduct of an agent
   already in his employment, must communicate to a surety his knowl-
   edge of the past criminal misconduct of such agent in the course of
   such past employment, in order to make such bond binding.
3. The mere non-communication of such knowledge, irrespective of
   motive or design, is a fraud in law, which will invalidate the obli-
   gation.
4. The comptroller is not the agent of the state for the purpose of making
   statements with respect to the moral standing of the treasurer; conse-
   quently such statements will not affect the state.
5. A plea alleging knowledge in the state of the misconduct of one of its
   officers, need not disclose how such knowledge was obtained.

On demurrer to the following pleas:

And these defendants, by way of amendment, for and in lieu of the seventh and eighth pleas by them heretofore pleaded, say, as to the moneys alleged in said declaration to have been embezzled by the said Josephus Sooy, junior, and withheld, that the said State of New Jersey ought not, by reason thereof, to have or maintain their aforesaid action against them; and thereupon they say that it is required by the laws of said state that the comptroller shall countersign and register all receipts for money paid to the treasurer, and that said comptroller shall, when necessary, draw in favor of the treasurer on all persons indebted to the state for moneys due, and on the presidents and directors of all corporations in which the state may own stock, for the dividends on such stock, as the same may become due; and thereupon they say that said moneys in said declaration mentioned, were received by said treasurer without any receipt countersigned by the comptroller being given for any of the same, or for any part thereof, and without being received upon or by reason of any draft drawn by said comptroller upon any person indebted to the state, or upon the president or directors of any corporation, in favor of the treasurer, but that the said moneys, and each of them, although paid by persons alleged to have been indebted to the state, were received by the treasurer without the knowledge of the comptroller, and either upon the receipt of said Josephus Sooy, junior, the said treasurer, alone, or without any receipt or other acknowledgment whatever given therefor. And so these defendants say that the said moneys were loans and advances or payments made to said Sooy as an individual, and not as treasurer of the state, nor for the use of the state, but for his own use; without this, that the said moneys, or any of them, were the moneys of the State of New Jersey, or mentioned in the condition of the said bond.

And this the said defendants, &c.

And for a further plea, by way of amendment as aforesaid, these defendants say that the said The State of New Jersey ought not to have or maintain their aforesaid action against

the defendants, because they say that the said defendants, on the day in the said declaration mentioned, to wit, in the county aforesaid, respectively signed and sealed the said writing obligatory in said declaration mentioned, only as sureties for the said Josephus Sooy, junior, who then and there was required to find such sureties for the faithful performance of his duties aforesaid, and without any valuable consideration then the said defendants thereto moving.

And these defendants say, that for a long time, to wit, one year, prior to the making and delivery of the said bond or obligation, the said Josephus Sooy, junior, had been and was the treasurer of the State of New Jersey, to wit, in the county aforesaid, and during all that time had been guilty of carelessness and negligence in the discharge of his duties as such treasurer, and in the keeping of his accounts as such ; and had, at various times, embezzled and wasted divers sums of money of them, the said plaintiffs, and applied the same to his own use ; and had, at various times, borrowed from divers persons divers sums of money, in the name of the plaintiffs, and as the said treasurer, but in reality for his own use ; and had been guilty of defalcation in his said office, and in regard of the said moneys in his hands as such treasurer ; all which was known to the said plaintiffs, and their agent in that behalf, to wit, the comptroller of said state, and was exhibited by the entries upon the account books of the said plaintiffs, kept in the office of the said treasurer, and in the office of said comptroller, respectively ; but all of which these defendants, and each of them, at the time of making and delivery of said writing obligatory, were wholly ignorant.

And these defendants say that prior to the sealing and delivery of said writing obligatory, and on, &c., the defendants being applied to and requested to become such sureties as aforesaid, and being desirous to assure themselves of their safety in so doing, made inquiry of the said comptroller of said state in regard to the integrity and business habits of said Josephus Sooy, junior, and as to the manner in which he had fulfilled the duties of said office, informing him, the said comp-

troller, of their object aforesaid ; but these defendants say, that notwithstanding the premises, neither the said plaintiffs nor the said comptroller made known to these defendants, or either of them, such information and knowledge aforesaid, touching the integrity or business habits of said Josephus Sooy, junior, as shown by him in his said office, nor touching any of the irregularities or defalcations aforesaid ; and not only therein made default, but the said comptroller averred, and then and there declared to said defendants, and each of them, prior to the making of said writing obligatory, and in order to induce them to execute the same, that the said Josephus Sooy, junior, was a man of integrity, and of good business habits, and had so shown himself in the performance of his duties as such treasurer; wherefore, these defendants, relying upon these premises, and being deceived and defrauded in that behalf, there and then made and delivered the said writing obligatory, which these defendants say they would not have done had they had any information or belief that the said Josephus Sooy, junior, had been guilty in any wise as aforesaid.

And this the said defendants are ready to verify ; wherefore they pray judgment if the said plaintiffs shall further have or maintain their aforesaid action against them.

Argued at November Term, 1876, before BEASLEY, CHIEF JUSTICE, and Justices SCUDDER, DIXON and REED.

For the state, *J. Vanatta*, Attorney-General.

For the defendants, *Cortlandt Parker*.

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE.   The principal question designed to be raised by the first of the pleas demurred to, and which has been substituted for the seventh and eighth pleas originally pleaded, is, whether the state can become possessed of moneys as owner, through the hands of its treasurer,

without a receipt for the same having been given, signed by such treasurer and countersigned by the comptroller. In support of the negative side of this proposition, it is said that if a debtor of the state pays money in settlement of such debt to the treasurer, and takes from him his receipt in his official capacity, that such money, by virtue of the conditions stated, does not pass to the state.

Inasmuch as the treasurer is the general fiscal agent of the state, and has an unquestioned capacity to receive moneys coming to it from its debtors, if a payment through such an organ is invalid, such result cannot emanate from general principles, but must be exclusively the effect of special legislative provision. And it is, in truth, on this ground exclusively, that the counsel of the defendants take their stand. To support this attitude we are referred to Section 6 of the act creating the office of comptroller, (*Nix. Dig.* 1003), which is in these words: "The comptroller shall countersign and register all checks drawn by the treasurer, and all receipts for money paid to the treasurer; and no receipts shall be evidence of payment unless so countersigned, and no loans shall be made by the treasurer unless with the concurrence of the comptroller."

This language appears to me to admit of but one interpretation; it is neither ambiguous or obscure; it declares, in the clearest and most explicit terms, what shall be the effect of a payment of money to the treasurer upon a receipt unsigned by the comptroller. The contention on the part of the defendants is, that such payment is void; but the statute does not say this, but, on the contrary, affixes a different effect to the irregularity; that is, it forbids the receipt to be evidence of the payment. The policy of the act undoubtedly is, to bring all moneys passing into the treasury under the eye of the comptroller; and this policy it endeavors to realize by making it the interest of the debtor paying money to the state, to require a receipt countersigned by the comptroller, for he is expressly cautioned that the receipt of the treasurer alone will not avail. There are few persons who, when they pay their

debts, are willing to do so without exacting an operative receipt; and it is on this custom of business that the law-maker in this case appears to have relied for the purpose in view, of making the comptroller a witness of the coming of all moneys into the coffers of the state. It may be that the security of the purpose intended has proved to be insufficient, but such a defect cannot be remedied by judicial construction, for the legislative language is plain, and the means for reaching the end in view, while it may not be perfect, is neither inapt, nor in the main, likely to be unsuccessful. If it was the intention to avoid a payment which was not re-ceipted for by the comptroller, nothing could have been easier than for the legislature to have so declared; but in the place of such a declaration we have the far milder penalty denounced; that is, that such receipts shall not be evidence of payment. A receipt is but a necessary incident of payment; it is merely a convenient form of proving payment, and the consequence is, the prohibition as evidence of a receipt of a certain charac-ter, cannot have the effect of invalidating the payment itself.

Nor does it seem to me that the defence would have pre-vailed on this point, even if the construction for which it contended should have been deemed correct. Admitting that the payment itself was prohibited by the section in question, still I can see nothing that would prevent a ratification of such payment on the part of the state. If a merchant should forbid his clerk from receiving payments until he, the mer-chant, had himself receipted for them, a payment to such clerk by a debtor cognizant of the prohibition, would be clearly invalid; but it would be equally plain that the prin-cipal could subsequently assent to the act, and thus validate the payment. In reference to such matters the *status* of the state is unquestionably the same as that of an individual; and if it was true that it had imposed the restriction claimed on its treasurer, it has not thereby relinquished any of the rights inherent in itself as principal, one of such rights being its option to reject or ratify an unauthorized act of agency. Therefore, if the state had said in this statute, in unequivocal

terms, that a payment made without a receipt countersigned by the comptroller, should be void, such declaration would have left the state, as it would have left an individual in a similar posture, either to affirm or disaffirm a payment made in the forbidden mode.  The statutory clause in question does expressly interdict a loan made by the treasurer without the concurrence of the comptroller, yet it is presumed that if a loan should be thus unlawfully made, that it would not be contended that it would not be within the competency of the state to ratify or repudiate such act of its treasurer at its pleasure.

The fatal error of the argument of the defence on this head has proceeded from the assumption that an unwarranted act of an agent is void, whereas it is merely voidable.  The result, therefore, is, that if it should be conceded that the moneys in question came to the hands of the treasurer in an illegal manner, and that the state had the right, originally, to disallow such receipt and to regard the debt as unpaid, nevertheless it seems undoubted that, upon the plainest legal principles, such illegality can be waived and the payment legalized by the state, if it shall so will.  To make the defence set up valid, it must appear not only that the treasurer had not legal authority to receive this money as the agent of the state, but that the state had relinquished its right to ratify the act of its agent.  The present suit for the recovery of these moneys, against the treasurer and his sureties, is a clear ratification of the act of the agent in receiving them, and, consequently, by its own force, would discharge the original debtor, even though he paid the moneys in a manner condemned by the statute; and such ratification must of necessity be conclusive on all the other parties interested in the transaction.

The next plea to which the demurrer is addressed, sets up, as a defence to the action, the non-communication on the part of the state of certain facts within its knowledge, touching the position and standing of the treasurer, and which it is alleged ought, in good faith, to have been disclosed to the sureties at or before the execution of the bond.

The allegations in the plea on this score are to this effect: that for a long time prior to the making and delivery of the bond, the said Josephus Sooy, junior, had, at various times, embezzled and wasted divers sums of the money of the state which had been committed to his custody, and had applied them to his own use, and had therein been guilty of defalcation in his office, and that such misdeeds were known to the state.

There are other statements in the plea which will be considered in the sequel, the foregoing averments being separated from these with a view of considering the naked question, whether the failure on the part of the state to disclose the circumstances stated will, *per se*, illegalize the bond.

Upon turning to the authorities it will be found that there has been some contrariety in judicial opinions touching this subject. That the obligee is bound, in morals and in law, to disclose to the surety, before he takes his guaranty, certain conditions of the transaction, does not appear to have been doubted, but the extent of such obligation has been the matter in disagreement. Lord Truro, in expressing his views in *Owen* v. *Homan*, 3 *Mac. & G.* 378, said : " I am not aware that either the text books or the decisions distinctly define the extent of the obligation and responsibility which rest upon the creditor in regard to the surety being made acquainted with all the material circumstances connected with the transactions to which the suretyship is to be applied. The cases which are reported, have generally arisen out of transactions in which there has been personal communication between the creditor and the surety, and the clear law, deducible from these decisions, is, that the creditor must make a full, fair and honest communication of every circumstance calculated to influence the discretion of the surety in entering into the required obligation. Lord Cranworth, while sitting as Lord Commissioner, well observed, that applications for special injunctions are very much governed by the same principles which govern insurances, where the assured is bound to give to the underwriter all the information in his power, to enable

him to estimate the character of the risk he is invited to undertake. I think the same principle is applicable to the case of sureties, and that, when communication does take place between the creditor and surety, the duty of the creditor cannot better be illustrated than by the case of the assured." But this view of the Lord Chancellor has been entirely exploded. In the course of the argument in the case of the *North British Insurance Co.* v. *Lloyd*, 10 *Exch.* 523, Baron Parke says that the decision in Owen *v.* Homan was carried to the House of Lords, and the opinion above cited of Lord Truro, was not acquiesced in; and in *Hamilton* v. *Watson*, 12 *Cl. & Fin.* 109, the doctrine is still more distinctly rejected. In this last case, Lord Campbell shows, to the point of demonstration, the impracticability of applying the rule of disclosure which obtains in favor of the underwriter, to the formation of suretyships.

But while it is thus settled that the principles of insurance and guaranty, in this respect, are not to be assimilated, and although the decisions have put the doctrine, so far as it regulates the relation of principal and surety, on the footing that fraud must exist to invalidate the obligation of the latter, nevertheless it seems to me that the facts set forth in this plea must be deemed a sufficient defence to this action. I justify this result by the assumption that if these facts thus stated are true, a fraud has been committed which will invalidate the bond sued on. The gravamen alleged in this plea is, that Mr. Sooy had, antecedently, been in the employment of the state as treasurer; and that during such term he had been guilty of defalcations and embezzlements, which were known to the state; and that no disclosure of such malpractices had been made to the sureties, they being ignorant of them. Such a statement describes a fraud; at all events, a fraud in law. A person called in as a guarantor of the honesty of an employé, has the right to infer that the continuance of such employé in the service of the master, is a tacit assertion, on the part of the latter, that there has, at least, been nothing criminal in the past conduct of the servant in the course of

his employment. Such an inference is the natural and reasonable result of the circumstances, and hence the obligee is chargeable with the knowledge that the surety is acting on that basis, and with such knowledge it is impossible to acquit him of bad faith if he allows the suretyship to take effect. Where silence is reasonably sure, in the ordinary course of things, to produce the effect of deceit, silence must be culpable, and, in law, the one should be regarded as the equivalent of the other. In the present instance the duty of disclosure was of the most imperative character; it is the case of an officer who had violated his official oath and defrauded the public, and had thus committed crimes of a nature highly penal. It was, therefore, obvious that in becoming bound for the honest conduct of such an officer, the sureties were acting under a delusion as to the real facts of the transaction. Neither in morals nor in law, can an obligee stand by and knowingly allow an obligor to take a risk which the former knows the latter has no intention to assume. Whatever else may be in doubt on this subject, it appears to me that the authorities have settled that under such circumstances not to disabuse the guarantor of the obvious mistake on which he is about to incur the obligation, is *suppressio veri*, because good faith calls for the disclosure requisite to give to the contract the effect which the one party knows the other party expects it to have. The leading case upon this point is that of *Smith* v. *The Governor and Company of the Bank of Scotland*, 1 *Dow* 272. A bond given with sureties by an agent of the bank was the subject of the suit, and the defence in the inferior court that such instrument had been obtained by undue concealment, on the part of the obligees, had been rejected. Such concealment consisted, in substance, in the non-disclosure, on the part of the obligee, that the official misconduct of the agent in being in arrear in his accounts and being insolvent. In the House of Lords, on appeal, the rejection of this defence was declared to be erroneous, and the law of the case was thus stated by Lord Eldon: "If an agent," said that eminent authority, " had been guilty of embezzlement, or other improper conduct, unknown to his

employer, the cautioner, (that is, the guarantor), would be liable. But if a man found that his agent had betrayed his trust, that he owed him a sum of money, or that it was likely he was in his debt, if, under such circumstances, he required sureties for his fidelity, holding him out as a trustworthy person, knowing, or having reason to believe, that he was not so, then it was agreeable to the doctrines of equity, at least in England, that no one should be permitted to take advantage of such conduct, even with a view to security against future transactions of the agent."

This exposition of the rule of law was referred to with approbation, and as putting the subject on a proper footing, in *Railton* v. *Mathews*, 10 *Cl. & Fin.* 934; and although this case has received a various interpretation, it does not seem to me that its import, with respect to the matter now under consideration, is to be misunderstood. It was a suit by a surety to set aside his bond, which was conditioned for the fidelity of a commission agent, on the ground of concealment, by the employers, of the fact that the agent had misapplied funds to his own use, and the difficulty in classifying the decision has arisen from the circumstance that the charge of the judge, which was reviewed in the House of Lords, not only enounced "that the concealment, to be undue, must be wilful and intentional," but must likewise be "with a view to the advantages the employers were thereby to gain." This instruction, containing these two several propositions, was adjudged to be inconsistent with legal principles, and the reason the adjudication has been thought, in recent cases, to be ambiguous is, because the instruction which was overruled contains more than a single principle. It has been said that this judgment does not declare that the concealment, to be undue, need not be wilful, but that its effect is to hold erroneous the conjoint statements that it must be both wilful and to the advantage of the person taking the security. But it seems to me a careful examination of the case will show that its force is not to be nullified by so strained a construction. It is true that Lord Cottenham, in stating the grounds of his

judgment, embraces in the clauses of his opinion, expressive of his disapprobation of the judicial rulings brought up for review, both the above-stated propositions in the connection in which they had been stated, but the language used by him, I think, quite clearly indicates that he considered each of such propositions to be erroneous. His language is : " The learned judge lays it down distinctly that the concealment, to be undue, must be wilful and intentional, with a view to the advantage they were thereby to receive. In my opinion, there may be a case of improper concealment or non-communication of · facts which ought to be communicated, which would affect the situation of the parties, even if it was not wilful and intentional, and with a view to the advantage the parties were to receive." It is not perceived how these expressions can be interpreted reasonably in the sense of indicating that the error which was adjudged to exist, was confined to either of the qualifications which had been grafted on the duty of the obligee to make disclosure of the misconduct of the party whose honesty had been guaranteed. Why refer to both qualifications if one of them only was effective in leading to a reversal ; and why use the term " non-communication " as well as " concealment," if it was understood that the " non-communication," in order to have a legal force, must have been wilful and intentional ? When we add to these indications the circumstance that Lord Cottenham cites, in the commencement of his opinion—the case of Smith v. The Bank of Scotland—in which the duty of disclosure is enounced in its unqualified form, there appears to be little reason to doubt what view was entertained by him. And even if we are left in uncertainty with respect to the opinion, in this respect, of this distinguished jurist, the effect of this decision as a precedent is scarcely affected, for an opinion was also delivered by Lord Campbell, which very explicitly and plainly repudiates the notion that the non-disclosure of the necessary facts, on the part of the recipient of the bond, to be illegal, must be intentional, or must proceed from a mercenary motive. I look upon this decision as a direct judgment,

affirmative of the doctrine that the failure to inform the surety, when his bond is taken, of the past misconduct of the principal in the line of the business to which the suretyship attaches, is, in law, without respect to the motive or intention of the obligee, a full defence to an action on such instrument.

This principle was re-affirmed in the case of *Phillips* v. *Foxall, L. R.*, 7 *Q. B.* 666, and Judge Story considers the doctrine so well established that he states it as unquestionable law in his treatise on *Equity Jurisprudence, vol. I.*, § 215. The same view of the law was taken in the case of the *Franklin Bank* v. *Cooper*, 36 *Me.* 179, the defendant, who had executed a bond as surety for the good conduct of a cashier of a bank, being held to be discharged by the failure of the bank to inform him that the cashier was a defaulter at the time when the bond was executed.

In my opinion, the law should be regarded as at rest upon this subject, to the extent that it is the duty of a person taking a guaranty for the good conduct of an employé, to disclose the past malpractices of such employé in the course of the business to which the guaranty relates, and that if such duty is not performed, the instrument so taken is, *ipso facto*, invalid. The continuance of an agent in an employment is an act so expressive of trust and confidence that it is tantamount to an express declaration to that effect, and hence it must, under usual circumstances, have all the effect of a meditated fraud, if the person so retaining the agent can be permitted to disown the implications inevitably arising from his own conduct.

The conclusion from this view is, that the facts set out in this plea, and which are admitted by the demurrer, are a legal defence to the present action.

I have already remarked that there are certain additional statements in this plea which were detached from the defence just disposed of, so that they might be considered by themselves. These allegations are to the effect that the defendants, before executing this bond, applied to the state comptroller for information with regard to the honesty and good conduct

of Mr. Sooy, and that the comptroller, with full knowledge of the defalcations of that officer, falsely asserted that his past conduct in office had been unexceptionable.

I am unable to see that these allegations possess, in this case, any legal force whatever. The comptroller has nothing to do with the taking of a bond from the treasurer, and his statements, therefore, with respect to any part of that transaction, can have no effect against the state. It is not the legal rule, as seems to be supposed, that because an agent or servant has knowledge on a certain subject, derived from his employment, that, consequently, he can make representations to bind his principal. In order to make such representations efficacious, an authority, express or implied, must be shown. Such authority is implied only when they relate to the business authorized to be done by the agent, and when made in the course of such business. *Ashmore* v. *Penn. S. T. Co.,* 9 *Vroom* 13. If a merchant, by his own act, should take a bond for the good behavior of one of his clerks, it would scarcely be contended that he would be affected by any information given by his book-keeper to the surety, as to the past conduct of such clerk, such book-keeper having no hand in the taking of the bond.

Nor does it follow that because there is no other officer from whom information with regard to the standing of the treasurer could be so well obtained, the comptroller is clothed with an agency for giving such information. The state has a right to forbear from constituting any one its agent for such purpose. A person taking such information from the comptroller, cannot look upon such communication as an official act, and if it turns out that he is fraudently deceived, he must look to the officer alone for redress of the injury sustained. This is the general regulation limiting the ability of the agent to charge his principal by his statements or communications, and it is a regulation that should, manifestly, be applied with the utmost stringency to the powers entrusted to public officers. Indeed, this latter class of agents have been thought, and with much reason, to be vested with but a

slender authority to bind their principals by their statements, except in cases in which such authority has been plainly conferred upon them. The rule, and the policy in which it is founded, are well stated in *Story on Agency*, § 307, *a*, in these words: "In respect to the acts and declarations and representations of public agents, it would seem that the same rule does not prevail, which ordinarily governs in relation to mere private agents. As to the latter, the principals are, in many cases, bound, where they have not authorized the declarations and representations to be made. But in cases of public agents, the government, or other public authority, is not bound, unless it manifestly appears that the agent is acting within the scope of his authority to do the act, or is employed, in his capacity as a public agent, to make the declaration or representation for the government. Indeed, this rule seems indispensable, in order to guard the public against losses and injuries arising from the fraud or mistake, or rashness and indiscretion of their agents." These principles are further elucidated in the authorities following, viz.: *Bank of the United States* v. *Dunn*, 6 *Pet.* 51; *Fairfield County Turnpike Co.* v. *Thorp*, 13 *Conn.* 172; *United States* v. *City Bank*, 6 *McLean* 130; *Peirce* v. *United States*, 1 *Nott & Hun.* (*Ct. of Claims*) 270; *Schumack* v. *Lock*, 10 *Moore* 39.

The consequence is, that all the allegations in the plea relative to the communications of the comptroller, are merely surplusage, and have no legal value in the connection in which they occur.

Touching the objection made to this plea by the Attorney-General, that it is insufficient, as it does not disclose or show the agency, or *media*, through which the alleged notice of the delinquency of the treasurer became known to the state, I am not aware of any rule requiring such specification in pleading. The general allegation that the state had knowledge on this subject, is according to the usual formula, and, although it may be difficult to say how such knowledge can be shown, as the demurrer confesses the fact, the difficulty

appears to relate to the methods of evidence, rather than to those of the statement in due form of the defence.

The plea is good in substance, and must be allowed to stand.