[No. 709.   October 2, 1897.]

## WELLS FARGO & COMPANY'S EXPRESS, Appellee, v. WILLIAM A. WALKER, Appellant.

PROMISSORY NOTE—MASTER'S FINDINGS OF FACT—SUFFICIENCY.—In a suit on a note, referred by consent to a master, his findings of fact, which were sustained by the evidence, were conclusive. Field v. Romero, 7 N. M. 630; De Cordova v. Korte, Id. 678.

ID.—PRINCIPAL AND SURETY—FRAUD—RELEASE OF SURETY.—Where, in a suit against a surety on a note, it appeared that the note had been given by the principal for money embezzled by him while in complainant's employ, for which he had been discharged, and the surety signed the note without any knowledge of these facts, which were withheld from him by complainant and its agents, and that, had he known the facts, he would not have signed the note—Held: That complainant was guilty of such fraud as to vitiate the note as to the surety.

*Appeal,* from a judgment for complainant from the Second Judicial District Court, Bernalillo County.   Reversed and remanded, with directions; Bantz, J., dissenting.

The facts are stated in the opinion of the court.

F. W. CLANCY and NEILL B. FIELD for appellant.

Complainant was bound to disclose to Walker the fact of Gilbert's dishonesty.   Story, Eq. Jur., sec. 215; Brandt. on Suretyship, 422; Bayl. on Sur. 294; Wilmington, etc., Co. v. Line, 18 S. C. 116; Franklin Bank v. Cooper, 36 Me. 179; Cotzhansen v. Simon, 47 Wis. 103; Bank v. Owen, 101 Mo. 581; Insurance Co. v. Thompson, 68 Cal. 208; Sooy v. New Jersey, 39 N. J. Law 135; Lee v. Jones, 108 Eng. Com. L.

397; Bank v. Stevens, 39 Me. 532; Daughty v. Savage, 28 Conn. 146; Densmore v. Tidball, 34 Ohio St. 411.

A contract of suretyship imports good faith and confidence between the parties in regard to the whole transaction, and if a party taking a guarantee from another suffers him to enter into the contract under false impressions as to the real state of facts such concealment will amount to fraud. Bayl. on Sur. 294; Moss on Bank. 226; Etting v. U. S. Bank, 11 Wheat. 67; Railton v. Matthews, 10 Clark & F. 943; Jewett v. Carter, 132 Mass. 335; Jones v. Building Ass'n, 94 Pa. St. 215.

The finding of the master in this case is entitled to all the weight which is given to the verdict of a jury in a case at law. Field v. Romero, 7 N. M. 630; De Cordova v. Korte, Id. 678; Shane v. Petersen, 99 Cal. 486; Machine Works v. Construction Co., Id. 421; Garrity v. Hamberger Co., 136 Ill. 499; Spencer v. Levering, 8 Minn. 461; Butler v. Cornell, 148 Ill. 276; Davis v. Schwartz, 155 U. S. 636; Crawford v. Neal, 144 Id. 585; Tilgham v. Proctor, 125 Id. 149; Medsker v. Bombrake, 108 U. S. 71; Richards v. Todd, 127 Mass. 172; Mason v. Crosby, 16 Fed. Cas. 1029.

Complainant, under the evidence in this case, should not have been allowed to recover any portion of the amounts voluntarily paid to the Building and Loan Association. Life Ins. Co. v. Middleport, 124 U. S. 534; 18 Am. and Eng. Ency. of Law 214; Railroad Co. v. Comm'rs, 98 U. S. 542; Mc-Crickart v. Pittsburgh, 88 Pa. St. 133.

C. N. Sterry for appellee.

There was no issue in the pleadings upon which the finding of the master could be possibly based. Reynolds v. Stockton, 140 U. S. 254; Grassholz v. Newman, 21 Wall. 481; Tapley v. Martin, 116 Mass. 275; McShane v. Howard, 20 Atl. Rep. (Md.) 776; Bank v. Stevens, 39 Me. 582; Wayne v. Bank, 52 Pa. St. 343; Bank v. Brownell, 9 R. I. 168; Crown v. Comm., 4 S. E. Rep. 721; Bank v. Otis, 62 N. Y. 788.

Under defendant's answer, the burden of proof was upon him to show by a preponderance of the evidence an intentional concealment of facts known to complainant, that defendant, Walker, should have known at or prior to the time of signing the note. Machine Co. v. Farrington, 23 N. Y. (Sup. Ct.) 591; Bostwick v. Voohis, 91 N. Y. (App.) 353; Dixon v. Pluns, 35 Pac. Rep. 1047; Roper v. Sangamon Lodge, 91 Ill. 518; Insurance Co. v. Holway, 8 N. W. Rep. 459; Railroad v. Gow, 59 Ga. 694; Telegraph Co. v. Barnes, 64 N. Y. 385; Life Ins. Co. v. Mabbett, 18 Wis. 698; Bank v. Mattingly, 18 S. W. Rep. (Ky.) 941; Bank v. Brayton, 22 Atl. Rep. (Pa.) 1045; McGee v. M. L. I. Co., 93 U. S. 93. See, also, Stewart v. Cattle Co., 128 U. S. 383; Farrar v. Churchill, 135 Id. 609; Walker v. Collins, 59 Fed. Rep. 70; Roberts v. Bank, 40 Pac. Rep. 225; Rench v. Keenan, 7 South. Rep.589.

LAUGHLIN, J.—The allegations in the bill of complaint material to this decision are as follows, to wit:

"Second. That heretofore, to wit, prior to December 20th, 1893, E. L. Gilbert became indebted to your orator for money theretofore had and received of and from your orator, in the sum of thirteen hundred and one dollars and twenty-hundredths ($1,301.20) and that on the twentieth day of December, 1893, for the purpose of securing the payment of said indebtedness, the said E. L. Gilbert, as principal, and W. A. Walker, as surety, made, executed and delivered to Charles H. Young, then and there an agent of your orator, their certain written instrument, of which the following is a true and correct copy:

" 'Albuquerque, Bernalillo County, New Mexico.
" '1,301.20.                    December 20th, 1893.
" 'Thirty days after date, without grace, we promise to pay to the order of Charles H. Young, agent Wells, Fargo & Co.'s Express, thirteen hundred and one dollars and twenty cents ($1,301.20), for value received, with interests from December twentieth, 1893, at the rate of twelve per cent per

annum; having deposited with said Charles H. Young, Albuquerque, New Mexico, as collateral security, with authority to sell the same at public or private sale, or otherwise at his option, on the nonperformance of this promise, and without notice, twenty shares (20), first series stock of the Cooperative Building and Loan Association of Albuquerque, New Mexico. Certificate No. 17.                              E. L. Gilbert.

" 'W. A. Walker.

" 'C. T. Linton.    J. L. Stubbs.'

"And at the same time, and as a part of the same transaction and for the purpose of securing the promises in said written instrument contained, they then and there delivered to the said C. H. Young, for and on behalf of your orator, a certificate of stock in the Cooperative Building and Loan Association of Albuquerque, New Mexico, a true and correct copy of which said certificate, with all the indorsements thereon made, is hereto attached, marked 'Exhibit A,' and made a part hereof as fully and completely as though herein set out in full.    That the said Charles H. Young indorsed on the back of said written instrument, above set forth, an indorsement as follows, to wit:

" 'Pay to the order of Wells, Fargo & Co.'s Ex.

" 'Chas. H. Young, Agent.' "

"Fourth.    Your orator further shows that no transfer of said certificate of stock has ever been made since its pledge by the owner thereof, W. A. Walker, to the said Young, for the benefit of your orator.

"Fifth.    Your orator further alleges and shows to the court that there is now due upon the instrument of writing hereinabove set out and set forth, to your orator, from E. L. Gilbert and W. A. Walker, the sum of thirteen hundred and one dollars and twenty cents ($1,301.20), with interest from December 20th, 1893, at the rate of 12 per cent per annum.

"Sixth.    Your orator further alleges and shows that the said W. A. Walker has notified the said Cooperative Building & Loan Association not to transfer said certificate of stock upon the books of said association, or to recognize the pledge

of the same as collateral security as aforesaid, and now pretends at times to deny any liability on his part on the said instrument in writing hereinabove set forth, and to deny that your orator has any right to hold said certificate of stock as collateral, or that it is security in any way for the payment of said instrument in writing set forth, but refuses to state to your orator, although requested so to do, any reason for so refusing and so stating, or any reason why said certificate is not collateral security for the payment of said written instrument as aforesaid.

"Your orator therefore prays the aid of this honorable court, that an accounting be had, and the amount due upon said instrument in writing hereinabove set forth be ascertained, and that the same be decreed to be a first and prior lien upon said certificate of stock shown by Exhibit A, hereto attached, and that the defendants E. L. Gilbert and W. A. Walker be decreed to pay unto your orator whatever may be due under the aforesaid instrument in writing, together with all the costs and expenses in this court incurred, and that, in default thereof, said certificate of stock be decreed to be sold according to law, and that out of the money arising from the sale thereof, after deducting from the proceeds of such sale just allowances for all disbursements, and expenses of said sale, including attorney's fees and counsel fees, and all expenses of this action, the proceeds be applied to the payment of the amount found due to your orator upon said instrument in writing."

The necessary parts of the separate answer of William A. Walker, defendant to the bill of complaint of complainants, are as follows, to wit:

"This defendant, further answering, says it is probably true, as alleged in the said bill of complaint, that prior to the 20th day of December, A. D. 1893, E. L. Gilbert became indebted to the complainant for money theretofore had and received of and for the complainant, in the sum of thirteen hundred and one dollars and twenty-hundredths ($1,301.20); and it is also true that on the 20th day of December, 1893, the

said E. L. Gilbert, as principal, and this defendant as
surety made, executed and delivered to Charles H. Young,
who was then and there an agent of the complainant, the
written instrument, a copy of which is set forth in the
said bill of complainant and it is also true that at the
same time, and as part of the same transaction, this
defendant then and there delivered to the said Charles
H. Young, for and on behalf of the complainant, a
certificate of stock in the Cooperative Building and Loan As-
sociation of Albuquerque, New Mexico, a copy of which said
certificate is filed with the said bill of complaint; but this
defendant denies that he made, executed, and delivered the
said written instrument to the said Charles H. Young, or
delivered the said certificate of stock to the said Charles H.
Young, for the purpose of securing any indebtedness then and
there due from the said E. L. Gilbert to the said complainant,
except as hereinafter fully disclosed and set forth.    This de-
fendant admits that it is true, as alleged and set forth in the
said bill of complaint, that the said Cooperative Building &
Loan Association of Albuquerque, New Mexico, is now, and
for the last five years has been, a corporation duly incorporated
under the laws of the territory of New Mexico; and this de-
fendant further admits that no transfer of the said certificate
of stock has ever been made by this defendant to the said
Charles H. Young for the benefit of the said complainant.
This defendant, further answering, denies that there is now
due upon the said instrument of writing, set forth in the said
bill of complaint, to the complainant from this defendant,
the sum of thirteen hundred and one dollars and twenty one-
hundredths ($1,301.20), or any other sum, with interest from
December 20, 1893, or from any other time, at the rate of 12
per cent per annum, or at any other rate.    This defendant,
further answering, says it is true that this defendant has
notified the said Cooperative Building and Loan Association
not to transfer the said certificate upon the books of said asso-
ciation, or to recognize the pretended pledge of the same as
collateral security; and this defendant says he denies any

liability on his part of the said instrument of writing set forth in the said bill of complaint, and denies that the complainant has any right to hold the said certificate of stock as collateral, or that it is security in any way for the payment of the said instrument of writing; and this defendant alleges the fact to be that on the 20th day of December, 1893, and for many years prior thereto, the said E. L. Gilbert was an employee of the complainant, and was then and there a dishonest person, and was well known by the said complainant and its agents and servants to be a dishonest person; and this defendant is informed and believes, and so charges the fact to be, that prior to the said 20th day of December, 1893, the said E. L. Gilbert had embezzled and converted to his own use large sums of money of the said complainant, which fact of embezzlement was on the said 20th day of December, 1893, well known to the said complainant, but was unknown to this defendant; and this defendant alleges that the said complainant and its agents and servants, fraudulently contriving and intending to injure this defendant, and· to enable the said E. L. Gilbert to procure this defendant to become the surety of the said Gilbert upon the said instrument of writing, did conceal from the defendant the fact of said embezzlement and wrongful appropriation of funds of the said E. L. Gilbert, with the intention and design on the part of the said complainant, its agents and servants, that the said Gilbert should procure this defendant to sign the said instrument set forth in the said bill of complaint, and should deliver the said certificate of stock therein mentioned, the said complainant, its agents and servants, well knowing that this·defendant would not then and there sign the said instrument of writing or deliver the said certificate of stock if informed and advised of the dishonesty and misconduct of the said E. L. Gilbert.

"This defendant, further answering, says that he is informed and believes, and therefore charges the fact to be, that prior to the month of December, 1893, the complainant, its agents and servants, discovered and became aware of the fact that the said E. L. Gilbert, who for a long time prior thereto

had been an employee of the said complainant, was a defaulter, and had embezzled and converted to his own use large sums of money then and there the property of the said complainant, and the said complainant, its agents and servants, then and there intending to deceive the public, and enable the said E. L. Gilbert to find sureties for the money so wrongfully embezzled and converted to his own use, got out and pretended to the people of Albuquerque and vicinity, through the public press and otherwise, that it was then and there the intention of the said complainant, on account of the meritorious services of the said E. L. Gilbert, and on account of his honesty and integrity and the efficient manner in which he had performed his duties as an agent and servant of the said complainant, to promote the said E. L. Gilbert to a position of greater responsibility and of increased emoluments.    And this defendant is informed and believes, and so charges the fact to be, that the said action by the said complainant, its agents and servants, was so taken with the intention and design on the part of the said complainant, its agents and servants, that the said E. L. Gilbert should impose upon this defendant or any other person who would-be willing to become his surety for the said moneys so wrongfully embezzled and converted to his own use.    And this defendant alleges that he was on the 20th day of December, 1893, wholly and entirely ignorant of the dishonest character of the said E. L. Gilbert, and of the fact that the said E. L. Gilbert had embezzled or wrongfully converted to his own use large sums of money, as hereinbefore alleged, but on and prior to the 20th day of December, 1893, the said E. L. Gilbert, as this defendant is informed and believes, with a full knowledge of the said complainant, its agents and servants, pretended and represented to this defendant that he had received from the said complainant a promotion and appointment to a position in the employ of the said complainant of increased responsibility and emolument, but that there was then and there certain irregularities in the accounts of the said E. L. Gilbert, as the agent of the complaint, with the cashier of the Atlantic and Pacific Railroad Company, and such

irregularities rendered it necessary and requisite that the said Gilbert should find security to the said complainant for about the sum of $1,301.20, and that he, the said Gilbert, had not in fact received the said money, and the same would be paid over by the Atlantic and Pacific Railroad Company and its cashier as soon as there could be an adjustment of the accounts of the said Gilbert with the cashier in accordance with the truth; and the said E. L. Gilbert then and there further represented to this defendant, with the full knowledge of the said complainant, its agents and servants, as this defendant is informed and believes, that, if the said Gilbert could find a surety or securities for about the said sum of $1,301.20, as aforesaid, he would continue in the employ of the said complainant in a position of increased responsibility and emolument. And this defendant alleges that he relied upon the representations of said Gilbert, so made as aforesaid, as true, and had no knowledge or means of knowledge that the same were in fact false; and although the said complainant, its agents and servants, well knew that this respondent was then and there about to sign the said instrument of writing, relying upon the false representations of the said Gilbert (E. L.), and that this defendant would refuse to sign the said instrument of writing if informed of the false character of the representations so made, the said complainant, its agents and servants, failed, neglected, and refused to apprise this defendant of the false character of the said representations, and of the dishonesty and embezzlement of the said Gilbert, but inequitably and unconscionably remained silent, and permitted this defendant to sign the said instrument of writing, and to deliver the said certificate of stock to the said Charles H. Young, as the agent of the said complainant; wherefore this defendant says that his signature to the said instrument of writing and delivery of the said certificate of stock were, and each of them was, obtained by the fraud and circumvention of the said complainant, and that the same were, and each of them was, without consideration, and that the said instrument of writing as to this defendant was and is, in equity, fraudulent and void.

"Further answering, this defendant says that he is informed and believes, and therefore charges the fact to be, that although it was well known by the said complainant, its agents and servants, on and prior to the 20th day of December, 1893, that the said E. L. Gilbert was a defaulter to the said complainant, and had embezzled and converted to his own use large sums of money of the property of the said complainant, and had therefore been guilty of the crime of embezzlement and felony under the laws of the territory of New Mexico, the said complainant, its agents and servants, as an inducement to the said E. L. Gilbert to make said false representations to this defendant, whereby he induced this defendant to become surety upon the said instrument of writing, and to deliver the certificate of stock to the said Charles H. Young, as agent of the complainant, did hold out and pretend to the said E. L. Gilbert that if he, the said E. L. Gilbert, would procure this defendant to make, execute, and deliver with him the said instrument of writing, and to deliver the said certificate of stock, by way of security for the moneys so feloniously embezzled and converted to his own use by the said E. L. Gilbert, that no prosecution would be instituted and carried on against him, the said E. L. Gilbert, on account of the said felony so committed.   And the defendant alleges that although, in equity and good conscience, it was then and there the duty of the said complainant to apprise him, the said defendant, of the dishonest character of the said E. L. Gilbert, and of the fact that the said E. L. Gilbert had theretofore feloniously embezzled and converted to his own use large sums of money of the property of said complainant, yet the said complainant, its agents and servants, well knowing that this defendant would not, if apprised of the true character of the said E. L. Gilbert, and of the fact of the said felonious embezzlement, sign the said instrument of writing, or deliver the said certificate of stock, contriving and intending that the said E. L. Gilbert should deceive and defraud this defendant, and should obtain his signature to the said instrument of writing, and a delivery of the said certificate of stock, by fraud and false pretenses, did

fail and neglect and refuse to disclose to this defendant the true character of the said E. L. Gilbert, and to inform this defendant that the said E. L. Gilbert had theretofore been guilty of the crime of feloniously embezzling and converting to his own use large sums of money of the property of the said complainant. And this defendant is advised by counsel, and believes, and therefore charges the fact to be, that the failure of the said complainant so to apprise this defendant of the dishonest character of the said E. L. Gilbert, and of the fact, which was well known to the said complainant, but unknown to this defendant, that the said E. L. Gilbert had before that time been guilty of the crime of feloniously embezzling large sums of money of the property of the said complainant, amounted in equity to a fraud by the said complainant upon this defendant, and renders the said instrument of writing voidable by this defendant upon the discovery of the said fraud; and this defendant now here pleads the said fraud of the said complainant in bar of all of the relief sought by the said complainant by its said bill of complaint."

"This cause being at issue, upon motion of C. N. Sterry, Esq., solicitor for said complainant, it is ordered, adjudged and decreed by the court that this cause be, and it hereby is, referred to W. D. Lee, one of the standing masters in chancery of this court, to take proofs as to the material allegations contained in the said bill of complaint herein, with directions to him to report the same to the court, with his opinion thereon, with all convenient speed."

"It is hereby mutually stipulated and agreed by and between the parties hereto that the following facts shall be considered by the master to whom this cause is referred, and by the court, to the same extent and as fully and completely as though proper allegations were made in the complaint and in the answer under which proof of the facts might be admitted upon the hearing of the cause, subject, however, to the objection of either party that each, any or all of the said facts are immaterial and incompetent; each party, however, waiving the objection that said facts or either of them are

irrelevant under the issues made by the pleadings.    The facts
so agreed to be true are as follows:    First.    The defendant
W. A. Walker, prior to the commencement of this action,
tendered to the complainant, in lawful money of the United
States, an amount sufficient to at that time reimburse the
complainant for all sums of money which it had advanced and
paid to the First National Bank of Albuquerque, to obtain
possession of the certificate of stock shown by Exhibit A, at-
tached to the complainant's bill, also to cover all payments at
that time made by the complainant to the Cooperative Build-
ing and Loan Association of Albuquerque, as assessment upon
said certificate of stock, and then and there demanded the sur-
render of said certificate.    Second.    That, at the time of the
execution and delivery of said note described in complainant's
bill of complaint, the certificate of stock shown by Exhibit A,
attached to said bill of complaint, was in the possession of the
First National Bank of Albuquerque, New Mexico, as col-
lateral security for loan due to said bank from the said W. A.
Walker, which at that time amounted to the sum of $100; and
that, in order to obtain possession of said certificate of stock
from said bank, the complainant was compelled to, and did, ad-
vance to said bank the sum of $100, and received from it
said certificate of stock, and that said sum so advanced to
said bank paid the indebtedness of the said W. A.
Walker, to said bank to the extent thereof, and said
amount was included in the total amount of said
note described in said bill of complaint.    This was
pursuant to the agreement which was made at that time be-
tween the parties hereto, and which resulted in the execution
of the note set out in the bill of complaint, and was a part
of the transaction.    Third.    That thereafterwards the com-
plainant, in order to prevent said stock shown by Exhibit A,
attached to said bill of complaint, from having fines assessed
against it by the Cooperative Building and Loan Association,
under and by virtue of its by-laws, paid upon said certificate
of stock, to the Cooperative Building and Loan Association of

Albuquerque, assessments duly and legally levied thereon under the by-laws of said association; that the assessments so paid were paid at the dates and in the amounts following, to wit: October 9th, 1894, $160, on assessments due from March to October, inclusive; on November 27th, 1894, $20; on December 25, 1894, $20; on January 29th, 1895, $20; on February 26th, 1895, $20; on April 9th, 1895, $20. These payments were voluntarily made by the complainant, and without any request from Walker that they should be made by the complainant." ·

The master took proofs, and reported his findings of fact and conclusions of law in favor of defendant Walker, and recommended that the complainant's bill be dismissed, to all of which complainant filed some 26 exceptions; and, on final hearing, the court sustained the exceptions, and found for complainant, and ordered that the said certificate of stock be sold in default of the payment of the sum found due from defendant Walker. From this decree the cause comes here on appeal.

Three general propositions will be considered in this case as they appear from the record: (1) The weight and effect to be given to the findings as reported by the master to the court below upon disputed facts. (2) The liability of defendant Walker upon the note sued on, and signed by him and Gilbert. (3) The right of the express company to recover from Walker the money paid by it to the loan association upon the certificate of stock held by it as collateral security upon said note.

1. The order of reference to the master was general in its terms, and authorized him to take proofs as to all the material allegations in the bill of complaint, and as to all material defenses set up in the answer, as well material defenses set up in the answer, as well also as to all the facts set out in the stipulation. There is nothing in the record to show that the order of reference was by consent, but counsel for the appellee in his brief says: "We are not contending that, under the ruling of this court in cases referred

PROMISSORY note: master's findings of fact: sufficiency.

to, the order made was not made with the consent of all the parties, but we are contending that the master had no right to reach a final determination of such conclusive character as would bring the case within the rule that the determination of the master upon conflicting facts is binding upon the court. The sixth finding of fact by the master is as follows: "That prior to the twentieth day of December, 1893, E. L. Gilbert had embezzled from the complainant $1,201.20; and the fact of such embezzlement was well known to the officers and agents of the complainant, and was not known to the defendant Walker to the extent and in the manner as known by the agents of the complainant." The part excepted to is that included in the lines above quoted, and it is contended by appellee that there is no evidence to support that finding. We think there is ample evidence to sustain the master in that finding. The testimony shows that Gilbert told Walker before the note was signed that he (Gilbert) had signed the voucher, but he had not received the money from the cashier of the Atlantic & Pacific Railroad Company, and that, as soon as the cashier returned, the matter would be explained, and that he (Gilbert) only wanted the security for a few days, and that, if he could secure the $1,201.20, he could take his promotion as route agent. It is stated in appellee's brief that Walker did not know the following facts, which Young, as agent for the complainant, did know, to wit: (1) "That Gilbert, on being charged with the signing of the voucher, admitted to Young that he had actually received the money." (2) "That upon discovering the facts stated, Young or the complainant, indefinitely suspended Gilbert, pending an investigation of the actual facts, and an explanation from Gilbert, from his position as route agent." The testimony shows that the note was actually signed on December 19th, but dated December 20th, and that Young, as agent for the express company, discovered the shortage of Gilbert on December 15th, and called Gilbert's attention to it, and, when he admitted that he had received the money, Young immediately indefinitely suspended him from the service of the company.

These facts were material upon the issues made by the pleading. The testimony also shows that J. L. Stubbs, superintendent of the express company at Denver, and C. T. Linton, inspector of the National Surety Company, which last-named company was liable on a bond to the express company for Gilbert's shortage, both came to Albuquerque on notice from the officers of the express company of Gilbert's irregularities. Then, it is clear that the officers and agents were in possession of those important facts with respect to Gilbert's embezzlement, which Walker was not. From a careful inspection of all the testimony, we conclude that the evidence is ample and sufficient to support the facts material, as found and reported by the master, and that the court erred in sustaining the exceptions of the appellee. We think this case comes clearly within the decisions of Field v. Romero, 7 N. M. 630, 41 Pac. 517; De Cordova v. Korte, 7 N. M. 678, 41 Pac. 526; Davis v. Schwartz, 155 U. S. 636, 15 Sup. Ct. 237; Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355.

2. The next question for consideration is as to the law of the case with respect to the liability of the defendant Walker on the note sued upon, upon the evidence as disclosed by the record, and the facts as found and reported to the court by the master. The facts as disclosed by the record are, substantially, that E. L. Gilbert had been employed as the agent of the express company for about eight years prior to the fifteenth day of December, 1893; that on December 14, 1893, H. H. Hatch, the route agent for the express company, checked up Gilbert's accounts in the office, and found them all correct. December 14th the following appeared in the Daily Times, a morning newspaper of general circulation published at Albuquerque, N. M.: "Deserved Promotions. Effective to-day, Mr. E. L. Gilbert becomes route agent for Wells, Fargo & Company, with headquarters in this city. Mr. H. H. Hatch, who has filled the position, has been transferred to the California Division. Mr. Gilbert has been connected with Wells-Fargo for a dozen or more years, most of which were spent as mes-

*PROMISSORY note: principal and surety: fraud: release of surety.*

senger. Five years ago he accepted the position of agent in this city, and has made friends of all who were thrown in contact with him by his gentlemanly and obliging manner. The company has fittingly shown its appreciation of a good man by the promotion." On the next day, the fifteenth of December, the following appeared in the Daily Citizen, an afternoon paper of general circulation published at Albuquerque: "H. H. Hatch, formerly route agent for the Wells-Fargo Express Company, promoted to a position in San Francisco, will leave for the west this evening. He will probably be accompanied west by E. L. Gilbert, the new route agent."

When Gilbert was checked out on the fourteenth day of December, and assigned to duty as route agent, he was succeeded by Charles H. Young, as the agent, and Young testified that: "I made a personal examination on the fifteenth of certain vouchers which are made out in connection with the settlement of moneys received from the Atlantic & Pacific Railroad Company, which were not ordinarily handled by the cashier at this office. This examination disclosed the fact that apparently there was several months' payment due from the railroad company; as I remember, about four. I considered it necessary to interview the cashier of the railroad company with relation to making those payments more promptly. I stated in my conversation with him, the cashier of the A. & P., that payments due our company for July and August, 1893, aggregating $1,201.20, had not been made. He immediately produced receipts of Mr. E. L. Gilbert, showing his acknowledgments as agent for Wells, Fargo & Company's Express of these amounts. Very soon afterwards I advised Mr. Gilbert what I had learned, and showed him the vouchers, stating that the amounts called for by them had not been accounted for to the company, and requested him to explain. This he could not do, except to say that he had signed the vouchers unquestionably, and had beyond a doubt received the money; and that he considered himself responsible to our company for the $1,201.20, and would see that it was made good promptly. * * * A. He was dismissed from the service of our

company on account of certain irregularities existing in his accounts, or, we had better put it, indefinitely suspended, December 15th, 1893." Young also admitted that he had read the newspaper notices referred to, and that he did not inform Walker that he had suspended Gilbert indefinitely from the service of the company; that he did not make the fact of Gilbert's shortage known to Walker or any one else. "Did you and Linton and Stubbs use your endeavors to conceal the fact [of Gilbert's defalcation] from the public?" The answer was: "We did not consider it our duty to advise the public in a matter which was the company's business." And again he said: "It was not my business to sound any warning to the public, even if I had known or felt that he [Gilbert] was unworthy of any assistance." That he knew Gilbert was making tremendous efforts to raise the money or procure some one to aid him in giving security for the money. That it was far from his intention to mislead the public. That he knew that, when Walker signed the note, he signed it as surety for Gilbert. That both Stubbs, the agent of the express company at Denver, and Linton, inspector for the National Surety Company, came to Albuquerque on notice sent out from his office of Gilbert's shortage. That the express company was secured for any shortage of Gilbert by the National Surety Company of Kansas City, Mo. That he preferred not to pursue the surety company if the shortage could be settled otherwise.

Walker testified that: "A. I saw it in the papers first, and he (Gilbert) told me that he had been checked out when the office was turned over to Young, and he had checked out all right, but, in looking over the vouchers from the A. & P., there was a shortage of $1,201.20 found; that there was a mistake in the A. & P. accounts, and that he did not know how it occurred at all, but that if he would— the company wanted him to make it good, but that, if they were going to turn him out, he wouldn't make it good; that he knew he was legally responsible for it. I asked him if some of the employees of the office, financial clerk, cashier, or the driver couldn't have been taking that money. He said, 'No,' he didn't lay the

blame on any one in the office at all.    That is about all that
occurred in that regard."     Gilbert said that, if he could secure
the money, he could take his promotion as  route  agent;  that
there was something wrong about the voucher; that the cashier
of the railroad company had given Young the wrong voucher;
that he said they had sent the vouchers for August and Sep-
tember receipted, instead of October and November; "that he
had never received the money;" that if he (Gilbert) could se-
cure the money for a few days, and until the cashier of the
railroad company returned, who was then away, he could ex-
plain it all.    Walker testified that he was ignorant of the fact
that Gilbert had been suspended or dismissed from the service,
and was ignorant of any criminality on the part of  Gilbert;
that he was in and  about  the  office  of  the  express  company
often with Gilbert, and saw Young, Stubbs, and Linton when
at the office between the fifteenth and the evening of the nine-
teenth, when he signed the note, but had no conversation with
either of them about Gilbert's matters; that he had known Gil-
bert well for five or six years; that they had been for some
years past intimate friends; that he had borne a good reputa-
tion all this time in Albuquerque for honesty  and  integrity,
and that he had stood well with the express company for hon-
esty, integrity and efficiency as their agent; that he believed
and relied upon the statements made to him by Gilbert as the
truth, and upon the notices of Gilbert's promotion as stated in
the newspapers which he had read at the time, and which had
never been contradicted; that if he had not believed Gilbert's
statements and the newspaper publications, or if he had known
or been informed that Gilbert had in fact received the money,
he would not have signed the note and delivered the certificate
as collateral.

There is some testimony tending to  show  that,  between
the fifteenth and the evening of the nineteenth of December,
Young and Stubbs notified the city marshal of Albuquerque to
keep watch on Gilbert, and, if he attempted to leave the city,
to arrest him.    Gilbert told Walker for the first time about
his troubles on the seventeenth of December, and Walker then

went with him to different persons, to assist him in raising the money or security; and Walker testified further: "Q. Why did you take all this interest in Mr. Gilbert's affairs? A. Well, Mr. Gilbert had been kind to me, and I knew that whether he was accused wrongfully or not, that the indemnity company and the Wells-Fargo being one and almost the same, that he would have to go to the penitentiary. * * * Q. You didn't succeed in getting money on the 19th, then, or did you visit these people on the 19th? A. I had given it up then, and didn't try to see any one else; and as I was getting in my cart at five o'clock on Tuesday evening, of the 19th, Gilbert and Linton came to me, and Gilbert remarked if I would be willing to let that security for that stock go his security for three or four days. I replied, 'Yes,' and I remarked to him that I was going after Mrs. Walker then; he would have to wait. He said that he would go for her. I got out of the cart and he took the cart, and went after her, Gilbert did. Mr. Linton and I went around to the express company's office. I told Mr. Linton that the security I had was in soak for one hundred dollars. He went to, I don't remember whether it was Stubbs or Young, and told them that he wanted one hundred dollars from them to get this security out. I think Mr. Young gave him the one hundred dollars, and we went around to Ilfeld's, Mr. Stubbs, Linton, and myself, and got the certificate of stock. * * * A. The indemnity company is responsible to the express company for all of its employees, and of course they wish to avoid paying any money if they can; and whenever they can't get security for the money, any shortage, they push the victim to the wall, to keep others from doing likewise, to prevent others from tampering with their funds." It further appears that the note was signed, and the certificate delivered, in the express company's office, in the presence of Young, Stubbs and Linton. There is nothing to show that Gilbert was permitted to resume his promotion with the express company, but his suspension on the fifteenth was final, but he was not arrested for this shortage. Afterwards further shortages were discovered by Young, and on January 9, 1894,

Young made complaint, charging Gilbert with the crime of embezzlement, and he was convicted, and sent to the penitentiary.

The facts are given as fully as possible, because the liability or nonliability of Walker depends upon the facts as disclosed by the record. The defense interposed is fraud, based upon the fraudulent acts and inequitable conduct charged against the express company, its agents and servants. Fraud is never presumed; it must be proved before it is available as a defense; but it may be proved directly or inferentially from all the facts and circumstances, and as well from the failure to state all material facts as from the facts as stated. 1 Story, Eq. Jur., secs. 190-193. In this class of cases there are three well defined lines of decision, viz.: (1) When the shortage or failure to pay over money received within the scope of his duties arises from the neglectful business habits, procrastination or carelessness, or a mere mistake of the agent, not accompanied by a conversion of the moneys of the principal to the use and benefit of the agent, and without any intent on his part to deprive his principal of it, and where there is no moral turpitude, but only a moral delinquency, on the part of the agent, and where the principal has used proper diligence and care in requiring from the agent proper and timely accountings and settlements. In this class of cases it is well settled that the sureties for the agent are bound for the failures to account for moneys received by him within the line and scope of his duties as such agent. Railroad Co. v. Gow, 59 Ga. 685, and authorities there cited. (2) Where the agent embezzles the funds of his principal, and, with intent to deprive him of the same wrongfully, appropriates them to his own use and benefit, where there is no negligence or intentional concealment of the improper conduct and wrongful acts of the agent on the part of the principal, and where the agent procures the bond to be signed by the sureties without the knowledge of the principal. In this class of cases it is a well-settled rule of law that the sureties are bound for the wrongful acts of the agent. Railway Co. v. Shaeffer, 59 Pa. St. 350; U. S. v. Van Zandt,

11 Wheat. 184; Insurance Co. v. Holway, 55 Iowa, 571, and cases there cited. (3) The third line of decisions is that where the principal has discovered or has a well-grounded belief, based upon reliable information, that his agent is a defaulter and a dishonest person, and then either requires security for his fidelity in the future, retains him in his service, holds him out to the public as a trustworthy person or conceals the misconduct and defalcation of his agent, either by his silence or false statement of facts which tend to increase the risk, and thereby the agent secures sureties who were ignorant of the true character of the agent, then the sureties becoming so under such circumstances are not bound.

We are of the opinion that the case at bar falls within the class of decisions last above stated. Gilbert had been the agent of the express company at Albuquerque for a number of years, and had been regarded and held out by it to the public as a trustworthy and efficient agent, and by the public of that city as an honest and trustworthy man. On December 14th, the express company's route agent, Hatch, checked his accounts up, and found them correct, and he was placed in the line of promotion, with additional responsibilities as route agent; and this fact was by Hatch given to the reporter for the Daily Citizen, who printed it as an item of news in his paper, and it is but fair to presume that the item which occurred in the Daily Times was obtained from some of the agents of the express company. It is not contended that these newspaper notices were given out under the authority of the express company, or that it is bound by them, even if made by its agents, but they went out, and were read by the public. Walker says he read and believed them, and Young said he read them, and it is not denied but that these items stated the facts as they then existed; and the public do, and they have a right to, rely upon statements printed in the public press as substantially true. The newspaper man, as a rule, makes a special effort to state in his news items facts only as they exist, and it is admitted that these statements were then true. But these newspaper items contain only a small part of the circumstantial facts, and

while these statements stood for four or five days before the public uncontradicted, and with the full knowledge of the express company's agent Young, holding Gilbert out as a trustworthy man, and still in the service of the company, and then in the line of promotion, yet the true and substantial fact was that Gilbert was a dishonest man, and wholly untrustworthy, and that he had been dismissed or indefinitely suspended, and was no longer in the service of the company, after December 15th, the very day the last item appeared in the public press. And no person but Young knew that Gilbert was a thief and a defaulter, unless it was Stubbs and Linton, who had been notified of Gilbert's defalcation.   Young says he did not consider it his duty to "sound any warning" of Gilbert's true character to the public.   Walker says that, if he had known the facts and the true character of Gilbert, he would not have signed the note.   Young knew that Gilbert was making efforts to procure some one to aid him in this matter.   He remained silent, kept the fact of Gilbert's dishonesty to himself, which no one but himself, Stubbs and Linton knew.   Walker says the indemnity company and the express company are "almost one and the same," and it is not denied.   Then Young says: "We didn't wish to take any action through his surety if the amount due the company could be settled by other means." Before the note was signed, and in the presence of Linton, Gilbert asked Walker if he would let the certificate of stock go as security for a few days; and then, in the absence of Gilbert, Walker told Linton that the certificate was pledged, and they went to the express company's office, and Young let Linton have the $100 with which the certificate was redeemed.   It is contended on the part of the appellee that Walker knew that Gilbert was a defaulter, because he testified that he knew that, whether Gilbert was accused wrongfully or not, he would have to go to the penitentiary if he did not account for the shortage.   This position is untenable, because it is the merest conclusion of Walker's, and is without any foundation, a mere statement. Gilbert stated to Walker positively that he had not received the money, and gave as a reason that the wrong vouchers had been

sent to Young, and Walker says he "relied implicitly upon his statements." And this he had a right to do from the actions and conduct of the agents of the appellee at the time.

It is perfectly manifest from the record that the express company, through its agents, Young and Stubbs, remained silent, and studiously concealed from the public the dishonest and untrustworthy character of Gilbert, and thereby inferentially, if not expressly, held out to the public that he was an honest man, and worthy of trust and confidence; and by such acts and conduct on their part, while acting as the agents of the express company, this defendant, Walker, was induced to sign the note and deliver the certificate of stock sued upon in this case; and their acts constitute a fraud in fact and a fraud at law. The inference to be drawn from all the testimony in this record runs to the irresistible conclusion that there was a complete understanding existing between Young and Stubbs, as agents for the express company, and Linton, as agent for the indemnity company, to remain silent and conceal the embezzlement of Gilbert and his dishonest character from the public, for the purpose of enabling him to obtain security for the shortage, and shift the risk from the indemnity company to some one else. True, Young says he had no intention to deceive the public; but his acts and conduct from the fifteenth to the evening of the nineteenth of December spoke louder and were of more force than the mere intent silently inclosed in his breast. It was the duty of Young, when he discovered that Gilbert was a thief, and guilty of a felony, under the law, to have him arrested, and, by so doing, proclaim to the public Gilbert's true character, and not permit him to go free for four or five days, with full knowledge that he was then seeking other innocent people, whomsoever he might impose upon, deceive and rob and for the express benefit of his principal, the express company, and to save the indemnity company from making good the embezzlement.

"When a thief is detected, confidence ought to be withdrawn, at least until those who are likely to be injured by his larcenies have been warned. To persist in supplying him with

money after he has made up his mind to steal, and you know it, is contrary to sound morality, unless you mean to bear the loss yourself.   Considerations, not of contract only, but of crime, are involved.   A question of honesty is raised, and honesty and equity are one.   You can not knowingly expose your own to the grasp of known dishonesty, at another man's risk, he being absent and unwarned.   To do so, and make him bear the consequences, is to do, not equity, but inequity." Railroad Co. v. Gow, supra.    And again it is stated: "Thus if a party, taking a guaranty from a surety, conceals from him facts which go to increase his risk, and suffers him to enter into the contract under false impressions as to the real state of the facts, such a concealment will amount to a fraud, because the party is bound to make the disclosure; and the omission to make it, under such circumstances, is equivalent to an affirmation that the facts do not exist.   So, if a party, knowing himself to be cheated by his clerk, and concealing the fact, applies for security, in such a manner and under such circumstances as holds the clerk out to others as one whom he considers as a trustworthy person, and another person becomes his security, acting under the impression that the clerk is so considered by his employer, the contract of suretyship will be void; for the very silence, under such circumstances, becomes expressive of a trust and confidence, held out to the public, equivalent to an affirmation."   1 Story, Eq. Jur., 215.   The principle stated and the illustration given by this learned author, we think, apply with great force to the case at bar.   That the facts concealed by the agent of the express company did go to increase the risk of the defendant is perfectly plain.   It was the duty of the agent to disclose the facts which went to increase the risk, and if he had done so 'at the proper time, and when he had opportunity, even in the absence of Gilbert, the defendant would not have assumed the risk, and, if so, he would then have been bound; but, instead of making the disclosure which it was his duty to do, he remained silent, and, more, he advanced the money of his principal to redeem the

certificate of stock, that it might be transferred to him, for the benefit of his principal. He knew that Gilbert had been cheating his principal, and he aided him to the extent of the money necessary to redeem the certificate. While the rule stated by Judge Story has not been followed to its fullest extent by all the courts of this country, yet the principle remains unshaken; and it will be found on examination that, when the rule was not followed to its fullest extent, the facts did not justify it, and, when the rule was modified, it was so done to comply with the facts and circumstances of each particular case. Mr. Parsons, in his law on Contracts, states the rule to be as follows: "In general, concealment is not in law so great an offense as misrepresentation, whatever it may be morally. It is certain, however, that the doctrine of fraud extends to the suppression of the truth in many cases, as well as the expression of what is false; for, although one may have a right to be silent under ordinary circumstances, there are many cases in which the very propositions of a party imply that certain things, if not told, do not exist." 2 Pars. Cont. 776; Kidney v. Stoddard, 7 Metc. (Mass.) 252. The case of Dinsmore v. Tidball, 34 Ohio St. 411, was an action on a bond given by Tidball, as agent, and his sureties, to indemnify the Adams Express Company against loss from the unfaithfulness or dishonesty of the agent. It appears from the statement of the case that Tidball had been station agent of the company at Alliance for some months previous to the execution of the bond, during which period he had embezzled moneys of the company. After the embezzlements occurred, "one Damsell, who resided at Crestline, Ohio, a route agent of the company, who had supervision of local agencies, was at Alliance, looking after a collection of $700 made by Tidball, which had been delayed in reaching the consignee. At this time, Damsell, in pursuance of general instructions, demanded a bond, with sureties, from Tidball, and furnished him a printed form, to be executed by him and his sureties, without knowledge as to the parties who were to become sureties. This printed form was afterwards signed by the defendants

in the absence of Damsell, and, being thus executed, was transmitted to Damsell at his home, in Crestline." The issue before the jury was as to the knowledge of the Adams Express Company of the defalcation of the agent Tidball previous to the execution of the bond. The verdict was for the defendants, and the court, in the argument in the opinion, said: "Admitting that a principal, in accepting a guaranty for the faithful and honest conduct of his agent, is not bound under all circumstances to communicate to the guarantor every fact within his knowledge which increases the risk, yet we think there can be no doubt, either upon principle or authority, that, when an agent has acted dishonestly in his employment, the principal, with knowledge of the fact, can not accept a guaranty for his future honesty from one who is ignorant of the agent's dishonesty, and to whom the agent is held out by the principal as a person worthy of confidence. The failure to communicate such knowledge under such circumstances would be a fraud upon the guarantor."

The undisputed facts are that the express company and its agent Young well knew of the defalcation of Gilbert, and the facts which increased the risk, and that they had ample opportunity to impart them to Walker, and that they did not do so, and that Walker was ignorant of the facts and circumstances which increased the risk, and that he would not have become security for Gilbert if he had known them. This brings the case directly within the rule laid down in Wayne v. Bank, 52 Pa. St. 343, wherein it is said: "We agree that a fraudulent concealment by the bank of the facts that Clark, their teller, was a defaulter at the time the defendant became his security, and accepted by the bank, would have been ground of release, in favor of the latter. Fraud vitiates and avoids all contracts." The case of Graves v. Bank, 10 Bush. 23, was a suit on bond by the bank against the defendant, as sureties for Mitchell, to recover for his defalcation as cashier. It appears that Mitchell, as cashier, made his reports from time to time of the condition of the bank to the comptroller, as required by law, and with the knowledge and consent of the

directors of the bank, and that these reports were published in the local newspaper, where the bank was situate, which reports showed the bank in good condition. The defendants read the reports, and afterwards signed Cashier Mitchell's bond as sureties. The court, in passing upon their liability on the bond, said: "We have therefore a case in which the directors of the bank held out to others as a trustworthy officer a man who had been guilty of repeated embezzlements and frauds, all of which might have been discovered by the exercise of slight diligence. However innocently the publication tending to show that Mitchell was an honest and faithful officer may have been made, the fact remains that the public had the right to act upon the presumption that those directors attesting the accuracy of the statements contained in the publication made some investigation at least to inform themselves as to the matters to which it related. The effect of the published report was to inspire the public with confidence in the officers of the bank, to disarm suspicion, and to prevent inquiry. The losses occasioned by the fraudulent appropriations by Mitchell of the bank's money after acceptance of his bond must fall upon either the association or upon the sureties. The latter are free from blame. They acted in the matter with reasonable prudence and discretion. They relied upon the truth of representations made by those having the right to speak for the bank."

In the case under consideration the losses sustained by the embezzlement of Gilbert must fall upon the indemnity company, or upon the defendant Walker. Linton, the agent of the indemnity company, was present, and took an active part in securing the money with which the certificate of stock was redeemed, and witnessed the note. We think Walker was blameless, and that the express company must pursue its remedy, if any it has, against the indemnity company. The case of State v. Sooy, 39 N. J. Law 135, was a suit against the state treasurer and sureties upon his official bond, and the defenses set up by the defendant's sureties' pleas were similar to the answer of the defendant Walker in the case at bar,

except that, prior to signing the bond, they had called upon the state comptroller, and requested information with respect to Sooy's past conduct of the office of state treasurer, which he had previously held, and the comptroller informed them that his conduct in the office had been honest and correct, whereas it had not been so. He had been guilty of defalcations and embezzlements, which fact was known to the officers of the state, but not to defendants. The plaintiff state interposed demurrers to all the pleas, and, assuming the facts stated in the pleas to be true, the supreme court, in delivering the opinion, said: "Such a statement describes a fraud; at all events, a fraud in law. A person called in as a guarantor of the honesty of an employee has the right to infer that the continuance of such employee in the service of the master is a tacit assertion, on the part of the latter, that there has at least been nothing criminal in the past conduct of the servant in the course of his employment. Such an inference is the natural and reasonable result of the circumstances, and hence the obligee is chargeable with the knowledge that the surety is acting on that basis, and with such knowledge it is impossible to acquit him of bad faith if he allows the suretyship to take effect. Where silence is reasonably sure, in the ordinary course of things, to produce the effect of deceit, silence must be culpable, and, in law, the one should be regarded as the equivalent of the other." In the case at bar the very silence of Young, the agent, and the concealment of the true character of Gilbert, and of his embezzlement of the funds of his principal, and that he had been indefinitely suspended or dismissed from the service of the company, induced Walker to believe that Gilbert was still in the employ of the company, and in the line of promotion in its service. This was the natural and reasonable conclusion to be drawn from all the facts and circumstances in the case. It is just what any ordinarily prudent man would do under the same circumstances.

The books are replete with authorities supporting the positions here taken, but we deem it unnecessary to refer to all of them, as those we have cited, we are of opinion, support the

contention of the defendant Walker upon the propositions
stated.    There are authorities which seem to support the
doctrine that, before the sureties can avail themselves of
fraud, they must first inquire of the principal the true char-
acter of the agent seeking to make the bond.    It has been
apparently so held in Insurance Co. v. Mabbett, 18 Wis. 698;
Roper v. Lodge, 91 Ill. 518.    But we think the facts in these
cases not similar to those in the case at bar, and are clearly
distinguishable.    The case of Bank v. Brownell, 9 R. I. 168,
is cited as authority that it is incumbent on the surety to make
inquiries before becoming such.    But the court in that case
was careful to say that "we think the safe rule is that, to avoid
the bond, there must be, on the part of the creditor, a fraudu-
lent concealment or withholding of something material for the
surety to know.    Would the facts which the defendant offered
to prove, if proved, have amounted to a frauduent concealment
or withholding?    It is not alleged here that the directors
withheld any information inquired for, or said or did anything
which could have a tendency to mislead the surety, or made
any—the least—effort to induce the defendant to become
surety.    If there had been an actual default, and an attempt
by the directors to cover it up or reimburse themselves at the
expense of the surety, the case would have been different."  The
last sentence quoted applies to just the facts in the case we
have under consideration; that is, that the agents of the ex-
press company, acting in harmony with the agent of the
indemnity company, attempted to shift the liability of Gil-
bert's embezzlement of the funds from the indemnity company
onto Walker, this defendant.    When the Rhode Island court
laid down the rule above stated, it was referring to the case of
Bank v. Cooper, 36 Me. 179, which holds the true rule to be
as we have stated it.

The mere fact that Young says he did not expose Gil-
bert's shortage, because he felt kindly towards him, and hoped
he could give a satisfactory explanation of it, is no excuse at
all.    It has no merit, because the fact remained that he stood
by, and in his presence saw and permitted Walker to be

imposed upon by Gilbert, for the benefit of his principal, the express company, and the indemnity company.   The contract of suretyship is, as a general rule, for the benefit of the creditor, and the surety is regarded in law as a favored debtor, and the law imposes upon the creditor the utmost good faith and fair dealing towards the surety at every step in the transaction; and it is the duty of the creditor not to knowingly and intentionally allow the surety to be imposed upon by fraud, deceit, or mistake; and if he does knowingly allow him to be so imposed upon, either by refusing to disclose truthful information affecting the risk he is about to assume, or remains silent, failing to disclose information  peculiarly within his own knowledge, touching the risk to be assumed, and which the circumstances surrounding the transaction would lead an ordinarily prudent man to believe was not within the knowledge of the party about to assume the risk, and of which, in fact, the party about to assume the risk was at the time ignorant, and a risk which the surety would not have assumed if he had been informed or known the true facts or circumstances, then, under such circumstances, the principal can not recover as against the surety, because the obligation of the surety so obtained is fraudulent.   Kerr, Fraud & M., sec. 96; Bank of Monroe v. Anderson Bros. Min. & R. Co. (Iowa), 22 N. W. 933; Magee v. Insurance Co., 92 U. S. 93; Wayne v. Bank, 52 Pa. St. 343; Railton v. Matthews, 10 Clark & F. 943.

In our view of this case, we are of opinion that the master's finding with respect to the testimony of the witness Edwin Bert is conclusive, and it becomes unnecessary to consider it here.

As we have found that the procurement of Walker's signature to the note, and the delivery of the certificate of stock, were fraudulent, and as the note and certificate are in the hands of the original party to the fraudulent acts, and that the payments were all made after notice to the holder that they, the note and certificate, were so obtained by fraud, and as fraud establishes taints and vitiates the entire contract and action, we are of opinion that on that ground, under all the

facts and circumstances as disclosed by the record, the express company can not recover.   Long and able briefs were filed by both sides, and able and exhaustive arguments were made by counsel, and, while we have not referred to all the cases cited, yet we have given most of them, and many other authorities, careful consideration.   The case will be reversed and remanded, with directions to the court below to enter a dismissal of the complainant's bill, at its costs, on the payment by said Walker to complainant of the sum of $100, with twelve per cent interest from December 19, 1893, up to the date that Walker made the tender in court or to the complainant.   It is so ordered.   Reversed.

Smith, C. J., and Hamilton, J., concur; Bantz, J., dissents. ·

BANTZ, J. (dissenting).—I most earnestly dissent from the opinion of the majority of the court in this case.   There is a clear and reasonable distinction between the case of one who signs an obligation as surety for the future good conduct or honesty of his principal, and a case like that at bar, where the surety signed for the payment of a past indebtedness, then definitely fixed.   In the former instance it may be true that it is the duty of the obligee to disclose to the surety known past delinquencies which materially affect the risk he is about to assume; but when the surety signs for a specific debt there is no obligation on the creditor to disclose past delinquencies, nor the circumstances out of which the debt arose.   With all proper deference, I think the court has misapplied to a case of the latter sort a rule relating to the former, and in doing so has launched a new and very dangerous doctrine.   Stripped of verbiage, the rule thus announced is that a surety on a note can defeat recovery, unless the payee discloses the circumstances out of which the debt arose, if it arose out of a breach of trust.   Such a proposition is not sustained by any cited case, and is a departure in the law of commercial paper.   The distinction between a suretyship for future honesty and one for an existing debt must be obvious upon reflection, and is

quite clearly pointed out in Machine Co. v. Farrington, 16 Hun. 591; and in the same case on appeal the New York court of appeals say: "The bond, in terms, referred to an existing indebtedness of Davis (the principal). The defendant made no inquiry of the company to ascertain the particulars, and the company made no representation. If the defendant deemed it material to be informed of the origin, nature or extent of the existing indebtedness, he should have inquired of the company before executing the bond. The company was under no duty to seek the defendant and make the disclosure. It was bound to act with good faith towards the defendant; but to hold the surety discharged by the omission to advise him of the particulars of the previous transaction with Davis, in the absence of any injury upon the subject, would establish a rule which would make instruments of the character of the one in question of comparatively little value." 82 N. Y. 125. See, also, Burks v. Wonterline, 6 Bush 24. But the facts in this case do not warrant the application of the doctrine, even if sound. Walker knew that the debt was claimed to be for a shortage as agent, and he admits that he was apprehensive that Gilbert would be sent to the penitentiary. He knew enough to put a prudent man upon inquiry. In MaGee v. Insurance Co., 92 U. S. 98, the court say (while fully recognizing that the slightest fraud by the creditor will relieve the surety): "But there is a duty incumbent on him (the surety). He must not rest supine, close his eyes and fail to seek important information within the reach. If he does this, and a loss occurs, he can not, in the absence of fraud on the part of the creditor, set up as a defense facts, then first learned, which he ought to have known and considered before entering into the contract." "In such circumstances the creditor is under no obligation, legal or moral, to search for the surety, and warn him of the danger of the step he is about to take. No case has gone so far as to require this to be done." "The company had the right to presume that the sureties knew all they desired to know, and were content to give the instrument without further information from any source."

Much stress is laid on the failure to communicate to Walker that Gilbert's employment and promotion had been suspended, and that Gilbert had admitted the receipt of the money. But the undisputed testimony shows that the express company's agent never knew that Walker contemplated becoming a surety until he came in and signed the note. The transaction itself was notice to him that there was a shortage in Gilbert's accounts. Hamilton v. Watson, 12 Clark & F. 109. If the creditor was bound to go further, and communicate such collateral matters as that the business relationship with the debtor had ceased, it is hard to tell where the limit would be fixed, and contracts of suretyship and guaranty would become valueless. The range of disclosures would become vexatious and annoying to the principal in the extreme. Lee v. Jones (Eng. Exch. B.), 4 Am. Law Reg. (N. S.) 487.

While it is true that the findings of fact by a master upon conflicting testimony will not be reviewed in cases referred by consent, yet it has never been held by this court that a mere scintilla of evidence is sufficient to support such a finding, or that it will be upheld when based upon illegal testimony or on erroneous legal principles. In Field v. Romero (N. M.), 41 Pac. 519, such a finding was likened to the special verdict of a jury. But while a verdict which is supported by sufficient evidence, or which is based upon conflicting testimony, or involves the relative credibility of witnesses, is unassailable, it is not otherwise conclusive. Davis v. Schwartz, 155 U. S. 631. There must be something more than a scintilla of evidence. The preliminary question for the court is "not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Coughran v. Bigelow, 164 U. S. 301; Improvement Co. v. Munson, 14 Wall. 442. In Kimberly v. Arms, 129 U. S. 517, the court say that such findings of a master will not be disturbed "unless clearly in conflict with the weight of the evidence upon which they are made." In Tilghman v. Proctor, 125 U. S. 149, the court say that such findings are not to be

set aside "unless there clearly appears to have been error or mistake on his part." In Crawford v. Neal, 144 U. S. 585, and Furrer v. Ferris, 145 U. S. 132, the court use this language: "Unless some obvious error has intervened in the application of the law, or some serious or important mistake has been made in the consideration of the evidence, the decree should be permitted to stand." All those cases were cited and approved in Davis v. Schwartz, supra. In De Cordova v. Korte, 41 Pac. 528, the court say: "If the findings of the master had been based upon illegal testimony, or if he had misapplied the law to the facts, in drawing his conclusion as to them, there would undoubtedly have been good ground for setting his findings aside. Nail Factory v. Corning, 6 Blatchf. 332, Fed. Cas. No. 14,196." A master, in such case, can not be upheld, who bases his findings upon vagrant newspaper items or on hearsay testimony. The conversations between Walker and Gilbert should have been excluded. Machine Co. v. Farrington, 82 N. Y. 125. Strip this case of the conversations between Gilbert and Walker (which the latter was suffered, under objections, to detail) and the newspaper items, and there is nothing left of the defense. The majority of this court admit that the express company was not bound by the newspaper items, yet by some process an estoppel in pais is assumed, and raised against the company, for failing to contradict them. Walker says he thought that, by paying or securing the shortage, Gilbert would retain his employment and secure promotion. But this belief was founded upon Gilbert's representations made in private conversations and upon newspaper items. Walker never made any inquiry of the company's agent. With all submission, the company was not bound to deny newspaper items, nor probe the mind of Walker to learn what induced him to go on Gilbert's note. Walker admits that he never made any attempt to learn the truth as to any of the representations made to him by Gilbert, because he had implicit confidence in Gilbert's honesty. It is this overconfidence of Walker in Gilbert that is now laid as a fraud at the door of the company.

The majority say the company should have had Gilbert arrested at once, and thus proclaimed to the public his true character. The company did not owe any such duty. If suspicious circumstances carried notice of Gilbert's crime to Young, why does it not reach to Walker? But my learned brothers do not, I think, give credit to the uncontradicted testimony that Gilbert represented to the company's agent just as he represented to Walker, that there was some mistake in the matter, which in time could be cleared up; that he was not criminally guilty, althought responsible legally, and would make the shortage good. If Walker could credit that statement, Young had the right to do so, also. Mr. Young quite sensibly and justly observes, "In view of the most positive declarations on his (Gilbert's) part as to his innocence, and in consideration of his long, faithful, and honorable services, we felt it our duty to give him the benefit of the doubt which was hanging over the situation, and that it would be entirely wrong, and a gross injustice, to lead the public to believe that he was a thief and a scoundrel, when possibly he was not." It was not until long after, when other defalcations were discovered, and no explanations were forthcoming, that the conclusion as to his criminality was reached, and his arrest was made, some twenty days after the note was signed. In the meantime an unaccounted shortage appeared, and the company's agent, as a prudent man, required it to be made good or secured. Walker vainly endeavored for several days to induce other persons to lend Gilbert the cash to meet that demand, but without success, and at Gilbert's request he signed the note as surety. When asked why he took so much interest in Gilbert, he answered, "Well, Gilbert had been kind to me, and I knew that, whether accused wrongfully or not, that, the indemnity company and Wells-Fargo being one and almost the same, that he would have to go to the penitentiary." Really, the record in this case discloses no material conflict in the testimony at all; and the conclusions of the master, in my judgment, were based upon suspicions, rather than competent evidence. A jury would not be at liberty to arbitrarily

disregard unimpeached and uncontradicted testimony, and neither can the master. The court below committed no error in setting his recommendations aside. The judgment of the district court should be affirmed.